STEKOLL PETROLEUM COMPANY V. HAROLD
H. HAMILTON ET AL.

No. A-3795. Decided February 11, 1953.
Rehearing overruled March 11, 1953.
(255 S. W. 2d Series 187)

*Shank, Dedman & Payne, Ralph B. Shank,* and *William S. Campbell,* all of Dallas, for petitioner.

Since the contract is incomplete, indefinite, uncertain and ambiguous in that it provides for the acquisition of the leases but fails to state or identify the leases; who are to transfer such leases; how, when and to what extent or in what manner such leases were to be transferred; and the terms conditions or character of the rights which were to be conveyed, the Court of Civil Appeals erred in holding that the contract sufficiently complied with the statute of frauds. Radford v. McNeny, 129 Texas 568, 104 S.W. 2d 472; Anders v. Johnson, 276 S. W. 678; Hamilton v. Glassell, 57 Fed. 2d 1032.

*Kilgore & Kilgore* and *James A. Kilgore,* all of Dallas, for respondents.

In reply to petitioner's propositions cited Hutchings v. Slemons, 141 Texas 448, 174 S.W. 2d 487; Matthewson v. Fluhman, 41 S. W. 2d 204; Jackson v. Anglin, 252 S.W. 1085.

MR. JUSTICE SMEDLEY delivered the opinion of the Court.

The District Court rendered summary judgment that plaintiffs Harold H. Hamilton and J. R. Rich, respondents herein, take nothing by their suit against defendant Stekoll Petroleum Company, petitioner in this Court. The Court of Civil Appeals, holding that the contract on which the suit is based sufficiently complies with the statute of frauds and that there are issues of fact to be determined, reversed the judgment of the District Court and remanded the cause. 250 S. W. 2d 645.

The suit is for the recovery of damages for breach of a contract for the conveyance or assignment of the oil and gas leasehold estate in 4000 acres of land in Cottle County. The defense is that the contract sued on is unenforceable under the statute of frauds, Subdivision 4 of Article 3995, Revised Civil Statutes of 1925, in that it fails to identify the lease or leases, and does not describe the land sufficiently. The facts as to the leases and the contract and other material facts disclosed by the record are in substance as follows:

By written contract executed January 4, 1950, M. A. and D. E. Richards, sons of T. J. Richards, deceased, agreed to execute and deliver to H. H. Hamilton and J. R. Rich oil and gas leases of three blocks of land in King and Cottle Counties, referred to as blocks Nos. 1, 2 and 3, the only description of the land being that block No. 1 consisted of approximately six and one-half sections of land in the south part of King and Cottle Counties, block No. 2 of approximately 5000 acres in Cottle County in the name of T. J. Richard Sons and block No. 3 of approximately nine and three-fourths sections of land in the name of T. J. Richards Sons. The contract provides that the second parties, Hamilton and Rich, shall commence the drilling of a well on block No. 1 within sixty days from the date of the contract and continue drilling operations until the reef limestone formation is reached or commercial production is secured at a lesser depth, and that within thirty days from the completion of that well the second parties shall "commence and prosecute the actual drilling of a well on block No. 2 to the same formation." The parties agree that the leases shall be executed by the first parties and placed in escrow with the First National Bank of Paducah, Texas, the leases covering each respective

block to be delivered to the second parties upon the commencement of the drilling of a well on that particular block. The leases were executed and placed in the hands of J. D. Bell, an attorney at law of Paducah, Texas, with instructions to place them in escrow with the Paducah bank.

Thereafter H. H. Hamilton entered into negotiations with M. H. Stekoll, vice-president of petitioner Stekoll Petroleum Company, which were consummated in the execution on January 26, 1950, by H. H. Hamilton and J. R. Rich, described as sellers, and Stekoll Petroleum Company, described as buyer, of the written contract on which this suit is based.

The contract is in four parts. The first part recites that sellers are the owners of oil and gas leases covering seven and one-half sections of land in King and Cottle Counties, describing them by section numbers, and that the leases by M. A. and D. E. Richards as lessors and sellers as lessees "all dated subsequent to January 1, 1950" are in escrow in the First National Bank of Paducah, Texas, under contract which provides for delivery of the leases when on or before March 4, 1950 "operations are begun for the drilling of a well" at a point in that block to be selected by the lessees. Provision is made for title examination, and if title is shown to be good the sellers will execute and the buyer will accept an assignment covering the land described in the leases, except five designated quarter sections to be retained by the sellers. It is agreed that for the assignment the buyer will pay $8,000 in cash which is being deposited in the first National Bank in Dallas, to be paid to sellers on buyer's compliance with the contract. The buyer agrees to "cause to be begun operations for the drilling of a well" on or before March 4, 1950, in the southeast one-fourth of one of the sections, and to prosecute it with diligence.

Part two of the contract relates to "outside leases" not involved in this suit.

In part three of the contract sellers represent that "they have five-year commercial leases covering approximately 5000 acres in Cottle County belonging to the T. J. Richards estate, said 5000 acres being described as". There follows a description by metes and bounds. This description is followed by the recital that "leases covering said 5000 acres are similarly held in escrow in the First National Bank, Paducah, Texas, subject to delivery upon the commencement of a well, all as fully appears

from said escrow contract and leases, reference to which is made for all purposes." There follows this paragraph:

"In the event the well on the first block hereinabove set out is begun and drilled by Buyer in accordance with the provisions of this contract, then Sellers hereby grant to Buyer as a part of the consideration for the first contract an option to acquire said leases on 4,000 of the 5,000 acre block No. 2 hereinabove referred to, said 4,000 acres to be selected by Buyer leaving Sellers 1,000 acres equitably checker-boarded in a fashion similar to the checker-boarding in the first block above identified, conditioned that Buyer will pay Two ($2.00) Dollars per acre in cash for the leases in the second block and will permit Sellers to reserve 1/16th of 7/8ths of the minerals until therefrom they have received the net sum of Forty Thousand ($40,000.00) Dollars, and conditioned further that Buyer will seasonably comply with the obligations contained in such escrow contract as to the 5,000 acre block and will drill said well to the same depth and under the same conditions as hereinabove set out with respect to the drilling of the well on the first block. The option as to this second block must be exercised or declined by Buyer by the time the first well on the first block has reached a depth of 5500 feet or by the time it is completed as a commercial producer of oil or gas or both at a shallower depth."

The fourth paragraph of the contract relates to a lease not involved in this suit.

On the approval of the title to block No. 1, the land described in the first part of the contract of January 26, 1950, Stekoll Petroleum Company began the drilling of a well on that block and an assignment of the leases on that block, dated March 3, 1950, was executed and delivered to it. The well was completed as a dry hole at a depth of 6004 feet on April 12, 1950.

On March 27, 1950, prior to the completion of the well on block No. 1, Stekoll Petroleum Company by letter addressed to Hamilton and Rich exercised its option given in the third part of the contract of January 26, 1950, to acquire leases on 4000 acres of the 5000 acres designated block No. 2, the letter stating that the consideration of $8,000 to be paid to Hamilton and Rich may be paid at any time before April 5, 1950. Hamilton and Rich noted and signed on this letter their acceptance of it.

M. H. Stekoll testified by deposition that after he wrote the letter of March 27, 1950, he made for his company a contract

with a Mr. Less for the drilling of an oil well on block No. 2 and that Mr. Less made arrangements to move onto block No. 2 to drill the well. He testified further that thereafter he advised Mr. Hamilton that Mr. Less was preparing to begin the drilling of a water well to supply water for the drilling of an oil well, and that the water well would be started on or before May 12, 1950. Thereupon by letter dated May 10, 1950, Hamilton and Rich advised Stekoll Petroleum Company that the escrow contract of January 4, 1950, between M. A. and D. E. Richards and Hamilton and Rich, required that actual drilling of an oil well be commenced on block No. 2 within thirty days after the completion of the well on block No. 1, that actual drilling must be begun by May 12, 1950, that operations by starting a water well as the Stekoll Company intended would not be a compliance with either contract, and would not protect the rights under the Richards contract, and that on that account Hamilton and Rich were preparing to protect their righs under that contract.

H. H. Hamilton testified by deposition that at midnight on May 12, 1950, he started digging slush pits for an oil well, and that on May 13 his contractor's rig was on the ground and he started actual drilling on May 15. The Stekoll Company did not drill or begin to drill a well on block No. 2. M. H. Stekoll testified by deposition that when he received the letter of May 10 he called his contractor, Mr. Less, and notified him of the contents of the letter and told him "Mr. Hamilton was going to move on instead." The breach of contract alleged by respondents as the basis of their suit for damages is the failure and refusal of petitioner to commence the actual drilling of an oil well on block No. 2 on or before May 12, 1950.

The Court of Civil Appeals in a carefully considered opinion, after setting out the contents of the several instruments above described and other facts shown by the record, and quoting the rule that two or more instruments taken together, if properly connected, can be considered sufficient to meet the requirements of the statute of frauds, reached the conclusion that the several instruments considered as a whole were sufficiently definite and certain for compliance with the statute. 250 S. W. 2d 645.

This general conclusion of the Court of Civil Appeals is attacked by petitioner in several points of error directing attention to inconsistencies and discrepancies which it is contended leave material terms and matters of description indefinite and uncertain, so that essential elements of the contract for assign-

ment of the lease or leases must be supplied by parol. It is shown that the contract of January 26, 1950, on which this suit is brought and which refers to the "leases" covering block No. 2 in somewhat general terms, states that they are held in escrow in the First National Bank of Paducah, Texas, whereas there was but one lease of the block, and according to the affidavits before the court on the hearing of the motion for summary judgment it was not in the First National Bank of Paducah at the time the contract of January 26, 1950, was executed. An affidavit by one of the attorneys for petitioner states that he knew that there were no leases from the T. J. Richards estate or from any other lessors covering the 5000 acres described in the third part of the contract of January 26, 1950, held in escrow in the First National Bank of Paducah, either on the 26th day of January, 1950, or at any subsequent date. An affidavit by respondent H. H. Hamilton states that "a lease" covering the 5000 acres, or block No. 2, and signed by the Richards heirs was on January 26, 1950, in the possession of J. D. Bell, an attorney at law, and that "thereafter" he deposited it in escrow in the First National Bank of Paducah.

The record contains a copy of the lease referred to in the affidavit of respondent Hamilton. It purports to lease a block of land in Cottle County, reciting that the "block consists of the following described land". Then it lists ten separately numbered tracts, giving survey and abstract numbers. The description of six of the tracts is defective in that it calls merely for so many "acres out of" the numbered survey. The contract of January 26, 1950, for the assignment to petitioner of "leases" on block No. 2 has a description in different form from that set out in the lease. It describes the 5000 acres, not by survey and abstract numbers, but by metes and bounds, as one tract. It is impossible to determine from the record whether the land described by metes and bounds in the contract is the same as that which the lease undertakes to describe. The Court of Civil Appeals in its opinion presumed that the lease and the contract cover identical lands. Whether the defects in the description in the lease and the difference between that description and the description in the contract are fatal or not, it seems that they create at least some uncertainty as to the identity of the lease to be assigned and as to the land included in the contract. Petitioner points out further inconsistencies revealed by comparison of the terms of the several instruments.

■ We need not determine, however, whether by reason of the

uncertainties above referred to the contract sued on is insufficient for compliance with the statute of frauds, since we have reached the conclusion that the contract fails, for the reasons to be stated, to identify that part of the 5000 acres as to which the lease is to be assigned to petitioner.

The uncertainty and indefiniteness as to description lie in this part of the contract of January 26, 1950:

"In the event the well on the first block hereinabove set out is begun and drilled by Buyer in accordance with the provisions of this contract, then Sellers hereby grant to Buyer as a part of the consideration for the first contract *an option to acquire said leases on 4,000 of the 5,000 acre block No. 2 hereinabove referred to, said 4,000 acres to be selected by Buyer leaving Sellers 1,000 acres equitably checker-boarded in a fashion similar to the checker-boarding in the first block above identified.*" (Emphasis added.)

The description above quoted, in our opinion, makes uncertain and indefinite the land on which petitioner is to acquire the lease and that on which the lease is to be left to respondents. Petitioner, the buyer, is to acquire the lease in so far as it covers 4,000 acres to be selected by it out of the 5,000-acre block. Had nothing further been added the description might have been, probably would have been, sufficient. It has been held that when a deed gives to the grantee a tract of land of so many acres to be selected by him out of a larger body owned by the grantor, the grantee does not acquire a present title, but acquires an equitable right to make the selection and thereby to become the owner of the tract selected, but the equitable right may be lost by delay in making the selection. Turner v. Hunt, 131 Texas 492, 496-497, 116 S. W. 2d 688, 117 A.L.R. 1066. And one of the courts of civil appeals has held, in Taylor v. Lester, 12 S. W. 2d 1097, with application for writ of error refused by this Court, that a contract consisting of a letter by the seller reciting that he is the owner of a block of leases covering 2500 acres in northwest McCulloch County, that the fee title is in certain named persons, and that the buyer may have his choice of any 1500 acres in said block for a stated consideration, together with the buyer's written acceptance showing the land that he selected, sufficiently identifies the land and meets the requirements of the statute of frauds.

The opinion of the Court of Civil Appeals herein cites a decision of the Appellate Court of Indiana and a decision of the

Supreme Court of Kansas, which hold that written contracts agreeing to sell and convey to the buyer a certain number of acres to be selected by the buyer out of a larger tract owned by the seller are valid and enforceable. Lingeman v. Shirk, 15 Ind. App., 432, 43 N. E. 33; Peckham v. Lane, 81 Kans. 489, 106 Pac. 464, 25 L.R.A. (N.S.) 967. The reason given for the decisions holding such contracts enforceable is that although the contract does not specifically describe the land to be acquired, there is a definite mode of ascertaining it described in the contract. On the other hand, the Supreme Court of Alabama held that a contract to purchase timber from a continuous block of 10,000 acres of land to be designated by the buyer on a day named did not comply with the statute of frauds and was unenforceable, being to all intents and purposes an agreement on the part of the buyer "to enter into a contract to purchase such lands as he might determine upon and designate." This decision criticizes the Indiana case above cited as unsound and not supported by any authority. Alabama Mineral Land Co. v. Jackson, 121 Ala. 172, 25 So. 709, 711, 77 Am. St. Rep. 46.

In the cases above cited the contract gave to the buyer the unqualified right to select the land, thus prescribing a method of certain and final identification. The contract under consideration gives no such unqualified right. By its terms the buyer in selecting the 4,000 acres of land to be acquired by him must leave the sellers "1,000 acres equitably checkerboarded in a fashion similar to the checker-boarding in the first block above identified." If there were a definite pattern of checker-boarding of the first block which could fairly be applied to the land in the second block, and if the contract required the same pattern to be used, not merely a pattern of similar fashion, and if the words "equitably checker-boarded" had not been used, a different question would be presented.

The contract and the other instruments do not disclose a clearly defined pattern for the first block. That block is of sections or parts of sections, apparently of 640 acres or about 640 acres each, and the contract provides that the assignment shall cover leases on all of two of the sections, on all of another two of them except the northwest quarter, on all of another two of them except the southwest quarter, and on all of one of them except the southeast quarter. Even if this made a definite pattern for the leases to be assigned on block No. 1, the same pattern could hardly be applied to the land covered by the lease on block No. 2, which includes tracts of varying acreage out of ten

surveys, several of which are not sections or parts of sections. However, the quoted language of the contract is that the checker-boarding of the acreage left to the seller shall be "in a fashion similar to the checker-boarding in the first block" and that it shall be "equitably checker-boarded". The use of the quoted words undoubtedly leaves the description of the land to be left to the seller, and consequently the description of the land to be acquired by the buyer, indefinite and uncertain. The contract does not contain the statement of data or means or a method by which, when followed, the land will be certainly and clearly identified. What is a checker-boarding in a fashion similar to that of the checker-boarding in the first block? How nearly similar must it be? What is an equitable checker-boarding?

█ The deposition of M. H. Stekoll shows that he construed the contract to mean that the parties were to get together later and make a fair selection of the acreage. This might be a practical construction, but if the contract meant that it would be nothing more than an agreement to make a contract in the future and such an agreement, there being no specification of the terms and details of the contract to be made, is not enforceable. Radford v. McNeny, 129 Texas 568, 104 S. W. 2d 472. The Court of Civil Appeals, in holding that the contract sufficiently describes the land notwithstanding the provision as to equitable checker-boarding of the acreage to be left to the sellers, seems to have been influenced by what it refers to as a failure on the part of petitioner to make a selection. It is to be remembered that the sufficiency of the description for compliance with the statute of frauds is to be tested by the terms of the contract when made. Taber v. Pettus Oil & Refining Co., 139 Texas 395, 162 S.W. 2d 959, 141 A.L.R. 808. Furthermore, there is neither allegation nor evidence that petitioner failed or refused to make a selection. The trial petition alleges as the breach relied upon the failure of petitioner to begin the actual drilling of a well on block No. 2 on or before May 12, 1950. It does not allege that petitioner failed or refused to make a selection of the land. There is nothing in the record as to any such failure on the part of petitioner. The parties were concerned about the beginning of a well on block No. 2 on or before May 12, 1950, as was required by the original escrow contract between Richards Brothers and Hamilton and Rich, so that the leases could be delivered. The controversy between the parties, as shown by the letter of May 10, 1950, was that petitioner was contending that beginning a water well on or before May 12, 1950, for use in drilling an oil well would be compliance with that contract, whereas respondents

took the position that commencing the actual drilling of an oil well was necessary.

Respondents suggest in their briefs that the application of the statute of frauds in this case would result in the perpetration of a fraud. There is no pleading alleging fraud or estoppel to plead the statute as a defense to this action for breach of the contract, and on the record there is, in our opinion, no issue as to fraud or as to any fact that would work estoppel. The contract being unenforceable when the statute of frauds is interposed as a defense, respondents cannot recover damages for its breach. Robertson v. Melton, 131 Texas 325, 115 S. W. 2d 624; 118 A.L.R. 1505; Taber v. Pettus Oil & Refining Co., 139 Texas 395, 162 S. W. 2d 959, 141 A.L.R. 808; Noxon v. Cockburn, 147 S. W. 2d 872, application for writ of error refused.

The judgment of the Court of Civil Appeals is reversed and the judgment of the District Court is affirmed.

Opinion delivered February 11, 1953.

Associate Justice Culver not sitting.

Rehearing denied March 11, 1953.