

NUMBER 13-12-00504-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**JOHN JAMES HARKINS, ET AL.,**                                    **Appellants,**

**v.**

**NORTH SHORE ENERGY, L.L.C.,**                                    **Appellee.**

---

### On appeal from the 267th District Court
### of Goliad County, Texas.

---

# MEMORANDUM OPINION ON REHEARING

### Before Justices Rodriguez, Garza and Perkes
### Memorandum Opinion by Justice Garza

We issued our original memorandum opinion in this case on December 12, 2013.

Appellants, John James Harkins et al.[1] ("Harkins") and Dynamic Production, Inc.

---

[1] Harkins co-owns the executive rights to the minerals under the land at issue. Dolores Marie Harkins, Janey Frances Harkins Hiller, Allen Anthony Harkins, Patricia Ailene Harkins, Wilson William Harkins IV, and Heath Alan Harkins are co-owners of the mineral rights, were named as parties in the trial court, and are named as appellants here. We will refer to these appellants collectively as "Harkins."

("Dynamic"), filed motions for rehearing and for en banc reconsideration. *See* TEX. R. APP. P. 49.1, 49.7. Appellee North Shore Energy ("North Shore") filed a response to the motions pursuant to our request, and appellants filed a reply to that response. We grant the motion for rehearing in part and deny it in part, dismiss the motion for en banc reconsideration as moot, withdraw our previous memorandum opinion and judgment, and substitute the following memorandum opinion and accompanying judgment in their place.

This sprawling oil and gas dispute involves a well drilled by North Shore on certain Goliad County land owned by Harkins. Harkins argues by three issues that the trial court erred by concluding that the well did not trespass on his property and by granting summary judgment to North Shore on that basis. Dynamic asserts by thirteen issues[2] that the trial court erred by rendering partial summary judgment in favor of North Shore and by rendering judgment against Dynamic after trial on the issue of tortious interference with contract. We reverse and remand.

## I. BACKGROUND

### A. The Option Agreement

On June 3, 2009, Harkins and North Shore entered into an agreement (the "Option Agreement") giving North Shore the exclusive right to acquire one or more oil and gas leases on a portion of Harkins' property. In exchange for the option, North Shore paid $140,000, representing $50 per acre, as consideration. The Option Agreement provided, in relevant part:

---

[2] The "Issues Presented" section of Dynamic's brief contains thirteen numbered items, eleven of which individually exceed 100 words in length. *See* TEX. R. APP. P. 38.1(f) (requiring that the "Issues Presented" section "state concisely all issues or points presented for review"). The "Argument" section of the brief contains nine sections and nine subsections which do not correspond to the issues listed in the "Issues Presented" section. Because briefing rules are to be construed liberally, *see* TEX. R. APP. P. 38.9, we accept the brief and endeavor to address all issues fairly raised.

2

[Harkins] hereby grants to [North Shore] the exclusive right on and under the following described lands, situated in Goliad County, Texas, to-wit:

> All that certain property more fully described on EXHIBIT "A" attached hereto and made a part hereof for all purposes.

(hereinafter called "Said Land"), the exclusive option to acquire oil and gas leases on all or a portion of Said Land under the terms and provisions of that certain Oil and Gas Lease form set forth on Exhibit "B" attached hereto and made a part hereof for all intents and purposes, subject to the following terms and conditions:

1.  For a period of twenty-four (24) months from the date hereof (hereinafter called the "Option Term"), [North Shore] shall have the exclusive option on Said Land.

2.  At any time and from time to time during the Option Term, [North Shore] has the right to exercise its exclusive option to acquire an Oil and Gas Lease covering all or a portion (as hereinafter provided) of Said Land pursuant to the terms and provisions set forth on the Oil and Gas Lease form attached as Exhibit "B", (hereinafter called the "Oil and Gas Lease") by tendering a check payable to [Harkins] in an amount equal to Two Hundred Dollars ($200.00) per net mineral acre for each net acre owned by [Harkins] selected by [North Shore] out of Said Land, on which such option and/or options are exercised by [North Shore]. . . .

    . . . .

7.  At such time as [North Shore] elects to exercise its option to acquire an Oil and Gas lease on Said Land pursuant to this Agreement, then such option as to such selected acreage shall expire and said Oil and Gas Lease shall become effective. . . .

    . . . .

14. This Option to Purchase Oil and Gas Lease is expressly made subject to the Oil, Gas, and Mineral Lease covering part of Said Land, and [North Shore] will be responsible for obtaining any consent from the Lessee that may be required. [North Shore]'s right to exercise its option to take an Oil and Gas Lease is also subject to the existing Lease on part of Said Land.

Exhibit "A" to the Option Agreement described two tracts of land, "Tract 1" and "Tract 2." Pertinent to this case, "Tract 2" was described as follows:

3

Being 1,210.8224 acres of land, more or less, out of the 1673.69 acres out of the Caleb Bennett Survey, A-5, Goliad County, Texas and being the same land described in that certain Memorandum of Oil and Gas Lease dated March 14, 1996 from The Estate of Janie Frances Harkins, Deceased, to Export Petroleum Corporation and being recorded in Volume 50 at Page 454 of the Official Public Records of Goliad County, Texas to which deed reference is here made for a more complete description of said land.

The March 14, 1996 Memorandum of Oil and Gas Lease referenced above (the "Export Lease") described the land to which it applied as follows:

Being 1273.54 acres situated in Goliad County, Texas, and being all of the 1673.69 acre tract described on EXHIBIT "A" attached hereto, SAVE AND EXCEPT a 400.15 acre tract described in a Memorandum of Oil and Gas Lease between the Estate of Janie Frances Harkins, deceased, and Hamm[a]n Oil & Refining, dated March 13, 1995, recorded in Volume ___, Page ___[3], of the Public Records of Goliad County, Texas.

The March 13, 1995 Memorandum of Oil and Gas Lease (the "Hamman Lease"), in turn, contained a metes and bounds description of the 400.15-acre tract referenced in the Export Lease. Exhibit "A" to the Export Lease states:

Field notes of a 1673.69 acre tract, being a part of a tract of land conveyed from Cyrus B. Lucas, et al., to John J. O'Brien by Deed dated February 7, 1931, and recorded in Volume 66, Page 325 of the Deed Records of Goliad County, Texas;

Said 1673.69 acre tract is comprised of a portion of the Solon Bartlett Survey, Abstract 4 and the Caleb Bennett Survey, Abstract 5, is situated in Goliad County, Texas, approximately 4 miles north of the town of Blanconia and is described by metes and bounds as follows:

Beginning at a point in the center of Sarco Creek . . .

[most of lengthy description omitted]

. . . .

Thence S 82° 09′ W a distance of 8663.39 feet to the place of beginning, containing 1673.69 acres, more or less. Save and Except a 400.15 tract

---

[3] As in original.

4

described in Participation Agreement dated November 8, 1995, between Hamman Oil and Refining Company and Alia Mesa Resources, Inc., et al., recorded in the Deed Records of Goliad County, Texas.[4]

## B.      North Shore's Attempt to Secure Leases

In September 2009, North Shore paid Harkins nearly $33,000 with the objective of securing a lease on a 169.9-acre area enclosed entirely within "Tract 2" as defined in Exhibit "A" to the Option Agreement.[5]  A formal lease agreement was never executed.[6] Nevertheless, North Shore proceeded to drill a well on the 169.9-acre tract that it identified.  In December 2009, North Shore and Harkins executed an easement so that the well could be connected to a gas purchaser's pipeline.  According to an affidavit by Catherine Schaper, one of North Shore's co-owners, North Shore paid Harkins and other surface rights owners over $17,000 for the easement, and the easement instrument contained a detailed survey plat showing the location of the well in relation to local boundaries and landmarks.  Schaper further averred that North Shore spent over $700,000 to drill and complete the well.  The well commenced production in January 2010.

Harkins knew that North Shore had built a well and initially assumed that it was situated on land covered by the Option Agreement.  However, in March 2010, Harkins, relying on the advice of landman Bill Bishop, came to believe that the well had in fact been drilled on land that was excluded from the Option Agreement.  In particular, Harkins believed that the well was actually situated on the 400.15-acre tract which was described in the Hamman Lease and referenced in the Export Lease.  According to Harkins, this

---

[4] This "Participation Agreement" does not appear in the record.

[5] North Shore also paid Harkins in an attempt to obtain a lease on a 570.941-acre area enclosed entirely within "Tract 1" as defined in Exhibit "A" to the Option Agreement.

[6] North Shore viewed the execution of a lease instrument as a formality because the Option Agreement provides that North Shore may exercise its option merely by making payment.

5

400.15-acre tract was specifically excluded from the description of land in the Option Agreement. Harkins therefore believed that the well constituted a trespass on his property. Harkins' attorneys informed North Shore of the problem and offered North Shore the opportunity to negotiate a valid lease of the land upon which the well was already situated. Those negotiations failed.

## C. Dynamic's Involvement

Meanwhile, Dynamic had expressed its interest in conducting seismic exploration activities on much of Harkins' land, including on the tract purportedly leased by North Shore. Initially, Dynamic approached North Shore about obtaining permission to conduct those activities; however, after negotiations with North Shore failed in February 2010, Dynamic took the position that the right to approve seismic exploration actually belonged to Harkins. Dynamic then proceeded to negotiate directly with Harkins about acquiring seismic exploration rights. On March 19, 2010, Dynamic sent to Harkins a "Letter of Intent to Acquire Oil and Gas Lease" (the "Letter of Intent") on the 400.15-acre tract identified in Exhibit "A" to the Hamman Lease.[7] Subsequently, in April of 2010, Dynamic and Harkins executed an agreement (the "Seismic Permit") granting Dynamic the right to conduct seismic exploration on various tracts of land, including:

> 1673.69 acres of land, more or less, situated in the Caleb Bennett Survey, A-5, Goliad County, Texas, being more fully described by metes and bounds in Exhibit "A" to that certain Memorandum of Oil and Gas Lease dated March 14, 1996 from the Estate of Janie Frances Harkins to Export Petroleum Corporation, recorded in Volume 50, Page 454, Official Public Records, Goliad County, Texas.

---

[7] The Letter of Intent stated that Dynamic proposed to pay Harkins $400 per net mineral acre for an oil and gas lease "covering 160 acres of land in the form of a square around the wellbore of the [North Shore] Well" and $250 per net mineral acre for a lease "covering 240.15 acres, being the balance of the 400.15 acres subject to this letter of intent."

On June 17, 2010, Harkins and Dynamic entered into an oil and gas lease agreement (the "Dynamic Lease") based upon the Letter of Intent sent by Dynamic in March. The Dynamic Lease was largely based on the form lease agreement attached as Exhibit "B" to North Shore's Option Agreement. However, it contained additional provisions stating that: (1) Harkins would assign all of his causes of action against North Shore to Dynamic, (2) Dynamic would indemnify Harkins for any liability incurred by Harkins (including "attorney's fees, expert's fees and court costs") "arising out of or by virtue of [the Option Agreement], the assignment of claims herein made or the granting of [the Dynamic Lease]"; and (3) Harkins would agree to participate in any litigation between Dynamic and North Shore.

## D. Litigation Begins

North Shore then filed the instant lawsuit against both Dynamic and Harkins. In its original petition filed in August 2010, North Shore contended that "[t]he Option Agreement as written does not reflect the true agreement of the parties" due to a "scrivener's error." North Shore asserted that the parties intended for the Option Agreement to cover the land upon which the well was drilled, and it requested that the agreement be reformed to explicitly include that land. North Shore's petition also included a suit to quiet title with regard to the land surrounding the well.

In subsequent amended petitions, North Shore contended that the Option Agreement included the disputed 400.15-acre tract and was not drafted erroneously.[8] North Shore further claimed that Harkins repudiated the Option Agreement and that

---

[8] North Shore's amended petitions retained the reformation claim, but asked for reformation only in the alternative to the trespass claim and only "if any material defects in the Option Agreement appear." The amended petitions also retained the pleadings to quiet title.

Dynamic tortiously interfered with the Option Agreement and committed "conscious and malicious geophysical trespass" by conducting seismic exploration on the allegedly leased land. North Shore further made an alternative claim for "recovery under assumpsit in lieu of geophysical trespass for the reasonable value of the use and occupation of the land and appropriation of trade secrets . . . ." In its amended petitions, North Shore requested actual and exemplary damages from Dynamic as well as an order compelling Harkins to specifically perform the Option Agreement by executing oil and gas leases on the tracts identified by North Shore in September 2009. Harkins and Dynamic asserted counterclaims of trespass, tortious interference with contract, and conversion, and sought damages, declaratory relief, attorney's fees, an accounting, and the appointment of a receiver to take over operation of the subject well.

### E. Summary Judgment Motions

The parties each moved for summary judgment. In its summary judgment motion, North Shore contended that the Option Agreement unambiguously included the 400.15-acre Hamman Lease tract and that, because North Shore complied with the agreement's provisions regarding invocation of the option, Harkins should be compelled to specifically perform his obligations under the agreement. North Shore noted that, until Dynamic became involved in the case, no party believed that the 400.15-acre Hamman Lease tract was excluded. As evidence, North Shore presented a map produced by Dynamic in discovery which purported to identify the land optioned to North Shore under the Option Agreement; the map demarcates the boundaries of the 400.15-acre Hamman Lease tract but does not appear to indicate that the tract was excluded from the land made available

8

for lease in the Option Agreement.[9] North Shore argued that the Hamman Lease had expired before the parties executed the Option Agreement and that "[t]he parties did not intend to pointlessly exclude a large square of useful acreage in the middle of an optioned tract . . . ." North Shore further argued that the Option Agreement gave it the "exclusive right to explore for oil and gas" on the optioned area. In support of the motion, North Shore attached affidavits by its principals Schaper and W. Troy West, as well as its attorney J. Robert Goldsmith, averring to the facts set forth in North Shore's petition and summary judgment motion.

North Shore also attached as summary judgment evidence certified copies of Texas Railroad Commission records indicating that a well which had been drilled by Hamman Oil & Refining Company pursuant to the Hamman Lease was plugged on March 22, 2006.

The motion for summary judgment filed by Harkins and Dynamic asserted both traditional and no-evidence grounds. First, the defendants' motion alleged that North Shore had produced no evidence that Harkins repudiated the Option Agreement. Second, Harkins and Dynamic argued that North Shore had produced no evidence that it had exclusive exploration rights regarding the land at issue and, therefore, North Shore's trespass, conversion, and conspiracy claims must fail. Third, the defendants asserted that North Shore had not established an assumpsit cause of action. Fourth, Harkins and Dynamic argued that North Shore was not entitled to reformation of the Option Agreement

---

[9] The map produced by Dynamic in discovery depicts the irregularly-shaped "Tract 2" identified in the Option Agreement as shaded. The 400.15-acre Hamman Lease tract, which is roughly square-shaped and lies entirely within "Tract 2," is demarcated by a dashed line on the map, but the interior of the 400.15-acre tract is shaded in the same manner as the remainder of "Tract 2."

Dynamic also produced another map in discovery that was apparently produced some time later and explicitly excluded the 400.15-acre area from "Tract 2."

because there was no unilateral or mutual mistake as to its terms; instead, Harkins and Dynamic alleged that the Option Agreement unequivocally excludes the 400.15-acre Hamman Lease tract from its property description. Finally, the defendants' summary judgment motion stated that North Shore produced no evidence establishing its entitlement to exemplary damages or attorney's fees.

Harkins and Dynamic also filed an objection to North Shore's summary judgment evidence, contending that various parts of the three affidavits were unreliable and inadmissible.

On September 9, 2011, the trial court: (1) denied the motion for summary judgment filed by Harkins and Dynamic in its entirety; (2) overruled Harkins's and Dynamic's objections to North Shore's affidavits; and (3) granted partial summary judgment to North Shore in a series of four separate orders. The four orders granting relief to North Shore stated respectively and in relevant part as follows:

> The Court finds as a matter of law that under the provisions of the [Option Agreement] . . . [Dynamic], which is not a party to the Option Agreement, does not have the right to conduct exploratory operations on either Tract 1 or Tract 2 as described in the Option Agreement during the term of the Option Agreement.
>
> . . . .
>
> It is hereby ORDERED that the Oil and Gas lease from [Harkins], as Lessors, to [Dynamic], as Lessee, covering 400.15 acres in the Caleb Bennett Survey, dated June 17, 2010 . . . is removed as a cloud on the rights, titles, and interests held by [North Shore] under [the Option Agreement], and the Oil and Gas Leases covering 169.9 acres which have this day been ordered by this Court to be executed and delivered.
>
> . . . .
>
> It is therefore ORDERED that within 15 days of the date of this Order, [Harkins] shall execute and return the respective Oil and Gas Lease counterparts to [North Shore] as lessee, covering 570.941 acres out of Tract

10

1 as described in the [Option Agreement] that are currently in the possession of [Harkins].

. . . .

It is therefore ORDERED that [Harkins] shall execute and return the form Oil & Gas Lease to [North Shore] as lessee which is attached as Exhibit B to the [Option Agreement], covering 169.9 acres out of the Caleb Bennett Survey A-5, Goliad County, Texas, within 15 days from the date the leases are delivered to Defendants' counsel.

## F.    Trial and Judgment

The cause proceeded to trial in July of 2012 on North Shore's tortious interference and assumpsit claims.[10]  After trial, the jury found that Dynamic intentionally interfered with the Option Agreement and caused North Shore to suffer $574,000 in actual damages.  The jury also found by clear and convincing evidence that North Shore's damages resulted from malice on the part of Dynamic, and it assessed $1.7 million in exemplary damages.  Finally, with respect to North Shore's assumpsit claim, the jury concluded that North Shore was entitled to $88,800 representing the "reasonable market value of the seismic testing at the time and place it occurred" and $46,250 representing the "reasonable market value of the processed seismic data."  The trial court denied the defendants' motions for new trial and to modify the judgment and rendered judgment on May 18, 2012:  (1) ordering Dynamic to pay North Shore actual damages of $709,050 and exemplary damages of $1,148,000,[11] plus postjudgment interest on those amounts;

---

[10] The trial court denied a motion filed by Harkins and Dynamic to sever the claims that had been determined by the summary judgment orders.

[11] "Exemplary damages awarded against a defendant may not exceed an amount equal to the greater of:  (1)(A) two times the amount of economic damages; plus (B) an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or (2) $200,000."  TEX. CIV. PRAC. & REM. CODE ANN. § 41.008(b) (West, Westlaw through 2013 3d C.S.).  North Shore sought punitive damages only on its tortious interference claim, for which the jury awarded $574,000.  The $1,148,000 in exemplary damages represents two times the tortious interference damages award.

11

(2) awarding North Shore trial attorney's fees of $405,338[12] "in connection with its suit on a written contract against [Harkins]," plus postjudgment interest, payable by Harkins; and (3) incorporating the previously-rendered summary judgment orders. The trial court rendered findings of fact and conclusions of law chiefly related to North Shore's recovery of attorney's fees. This appeal followed.

## II. DISCUSSION

### A. Summary Judgment

Harkins's first two issues and Dynamic's first, second, and seventh issues argue that the trial court erred in its September 9, 2011 summary judgment rulings.

#### 1. Standard of Review

A motion for summary judgment may be brought on no-evidence or traditional grounds. *See* TEX. R. CIV. P. 166a(c), (i). A motion for no-evidence summary judgment is equivalent to a motion for pretrial directed verdict, and we apply the same legal sufficiency standard on review. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006); *Ortega v. City Nat'l Bank*, 97 S.W.3d 765, 772 (Tex. App.—Corpus Christi 2003, no pet.) (op. on reh'g). Such a motion should be granted if there is no evidence of at least one essential element of the claimant's cause of action. *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (per curiam). The burden of producing evidence is entirely on the non-movant; the movant has no burden to attach any evidence to the motion, and if the non-movant produces evidence raising a genuine issue of material fact, summary judgment is improper. TEX. R. CIV. P. 166a(i). All that is required of the non-movant is to

---

[12] The final judgment also awarded conditional appellate attorney's fees of $73,750 in the event an unsuccessful appeal is made to this Court, and $33,750 in the event an unsuccessful appeal is filed with the Texas Supreme Court.

produce a scintilla of probative evidence to raise a genuine issue of material fact on the challenged element. *Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 172 (Tex. 2003); *Ortega*, 97 S.W.3d at 772. "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion of a fact.'" *Ortega*, 97 S.W.3d at 772 (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)); *see Forbes*, 124 S.W.3d at 172. Conversely, more than a scintilla of evidence exists when reasonable and fair-minded individuals could differ in their conclusions. *Forbes*, 124 S.W.3d at 172; *Ortega*, 97 S.W.3d at 772 (citing *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994)). In determining whether the non-movant has produced more than a scintilla of evidence, we review the evidence in the light most favorable to the non-movant, crediting such evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Tamez*, 206 S.W.3d at 582; *City of Keller v. Wilson*, 168 S.W.3d 802, 825, 827 (Tex. 2005).

We review the trial court's granting of a traditional motion for summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003); *Branton v. Wood*, 100 S.W.3d 645, 646 (Tex. App.—Corpus Christi 2003, no pet.). A motion for traditional summary judgment must show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). The movant bears the burden of proof, and all doubts about the existence of a genuine issue of material fact are resolved against the movant. *See Sw. Elec. Power Co.*, 73 S.W.3d at 215. We take as true all evidence favorable to the non-movant, and we indulge every

reasonable inference and resolve any doubts in the non-movant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

When both parties move for summary judgment and the trial court grants one motion and denies the other, we review both parties' summary judgment evidence and determine all questions presented. *See FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000); *Warrantech Corp. v. Steadfast Ins. Co.*, 210 S.W.3d 760, 765 (Tex. App.—Fort Worth 2006, no pet.). Our task is to render the judgment that the trial court should have rendered. *See FM Props.*, 22 S.W.3d at 872; *Warrantech*, 210 S.W.3d at 765. We will affirm a summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 157 (Tex. 2004).

### 2. Applicable Law

When a written contract is so worded that it can be given a certain or definite legal meaning or interpretation, it is not ambiguous, and the court construes it as a matter of law. *Am. Mftrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). On the other hand, a contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). This determination is made in light of the circumstances present when the parties entered into the contract. *Ganske v. Spence*, 129 S.W.3d 701, 707 (Tex. App.—Waco 2004, no pet.) (citing *Grimes v. Andrews*, 997 S.W.2d 877, 881 (Tex. App.—Waco 1999, no pet.)). An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract. *Columbia Gas*

14

*Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996).  For an ambiguity to exist, both interpretations must be reasonable.  *Id.*

Extrinsic evidence of intent is admissible only if the contract is ambiguous on its face.  *See Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 283 (Tex. 1996); *CenterPoint Energy Houston Elec., L.L.P. v. Old TJC Co.*, 177 S.W.3d 425, 431 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("A court may consider the parties' interpretations of the contract through extrinsic or parol evidence only after a contract is first determined to be ambiguous.").  A mere disagreement about the proper interpretation of a contract, however, does not make the contract ambiguous; the instrument is ambiguous only if, after application of the rules of construction, the contract is reasonably susceptible to more than one meaning.  *Brown v. Havard*, 593 S.W.2d 939, 942 (Tex. 1980); *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 157 (1951).

### 3.    Interpretation of Property Description

Harkins argues by his first issue that the trial court erred in granting partial summary judgment to North Shore, and in denying summary judgment to Harkins.  Dynamic similarly argues by its first issue that the trial court erred in granting partial summary judgment to North Shore, and it argues by its second issue that the trial court erred by denying summary judgment to Dynamic.  These issues each pose the question of whether North Shore's well was drilled on land covered by the Option Agreement.[13]  This is the central issue in this appeal and it turns on the interpretation of the description of land in the Option Agreement and the references contained therein.

---

[13] The trial court concluded that the well was, in fact, drilled on optioned land.  This finding supported the trial court's orders (1) removing the Dynamic Lease as a cloud on North Shore's title, and (2) compelling Harkins to deliver leases to North Shore per the Option Agreement.

15

We find that the description of land in the Option Agreement is capable of more than one reasonable interpretation. The description of "Tract 2," where North Shore drilled its well, is as follows: "Being 1,210.8224 acres of land, more or less, out of the 1673.69 acres out of the Caleb Bennett Survey, A-5, Goliad County, Texas and being the same land described in [the Export Lease]." This description can have two different reasonable meanings depending on what the phrase "and being the same land described in [the Export Lease]" is understood to modify. One reasonable interpretation would be that this phrase modifies "1,210.8224 acres of land, more or less." That interpretation would be reasonable because the reference to "1,210.8224 acres" and the reference to "the same land described in [the Export Lease]" are both preceded by the word "[b]eing," indicating that "1,210.8224 acres" refers to the same land as that to which the Export Lease applies. Moreover, the total amount of land to which the Export Lease applies is 1,273.54 acres,[14] which may be considered "more or less" equivalent to "1,210.8824 acres." *See Slagle v. Clark*, 237 S.W.2d 430, 433 (Tex. Civ. App.—Amarillo 1951, no writ) (noting that the presence of the words "more or less" in a deed "indicates a sale in gross, and not by acre" and constitutes "prima facie evidence that the parties intended to risk a not unreasonable gain or loss in the estimated quantity"). This interpretation, favored by Harkins and Dynamic, would mean that "Tract 2" is identical to the land to which the Export Lease was applicable—i.e., it would exclude the land upon which North Shore drilled its well.

North Shore argues that this interpretation is unreasonable because, "when one document refers to another for *descriptive* purposes, only the parts of the referenced

---

[14] 1,673.69 acres minus the 400.15-acre Hamman Lease tract.

16

document that can be harmonized with the information in the main document are looked to and the rest of the referenced document is to be ignored." (Emphasis in original.) North Shore cites *American Savings & Loan Ass'n of Houston v. Musick*, 531 S.W.2d 581, 585 (Tex. 1975), and *Sharp v. Fowler*, 252 S.W.2d 153, 154 (Tex. 1952), for that proposition, and it argues that "[t]he only part of the Export [Lease] that can be harmonized with information in the Option Agreement is the surveyor's field notes on its Exhibit A describing the boundaries of a 1673.69 acre tract—exactly the size referred to in the Option Agreement in its description of Tract 2." We note that the *Musick* and *Sharp* cases do not explicitly support the tenet of law set forth by North Shore. In any event, we do not find this argument persuasive. As noted above, the Export Lease described a 1,273.54-acre tract consisting of 1,673.69 acres minus the 400.15-acre Hamman Lease tract. This description can be harmonized with the Lease Agreement's description of "1,210.8224 acres of land, more or less, out of the 1673.69 acres . . . ." *See Slagle*, 237 S.W.2d at 433.

A second reasonable interpretation of the Lease Agreement's property description would hold that "and being the same land described in [the Export Lease]" instead modifies the phrase "the 1673.69 acres out of the Caleb Bennett Survey." Under this interpretation, the 1,673.69 acres referred to in the "Tract 2" description are the same 1,673.69 acres "described" in the Export Lease—but *before* the 400.15-acre Hamman Lease tract is excluded. This interpretation is reasonable because the Export Lease does, in fact, "describe" a tract of exactly 1,673.69 acres—even though it then explicitly states that the lease does not *apply* to all of that tract (that is, the Hamman Lease tract is part of the 1,673.69-acre tract *described* in the Export Lease but is not part of the property

17

actually *leased* by that instrument). Under this interpretation, the Option Agreement's reference to "1,210.8824 acres" could be viewed as merely referring to North Shore's right to select a certain amount of land out of the 1,673.69 acres made available to it.[15] This interpretation, favored by North Shore, would mean that North Shore had the option to lease any 1,210.8824 acres out of the entire 1,673.69-acre tract—including the Hamman Lease tract, where it drilled its well.

Harkins and Dynamic contend that this interpretation is unreasonable because it would contravene the statute of frauds. *See, e.g., Bailey v. Mullens*, 313 S.W.2d 99, 102 (Tex. Civ. App.—San Antonio 1958, writ ref'd n.r.e.) ("A sound rule of construction requires an interpretation under which the deed will be valid and operative in preference to one which will nullify it."). With respect to property descriptions, the statute of frauds requires "a written memorandum which is complete within itself in every material detail, and which contains all of the essential elements of the agreement, so that the contract can be ascertained from the writings without resorting to oral testimony." *Cohen v. McCutchin*, 565 S.W.2d 230, 232 (Tex. 1978). Harkins and Dynamic claim that North Shore's interpretation of the Option Agreement fails this test because, though it purports to allow North Shore to select a certain amount of acreage, it does not contain express "selection language" explicitly granting North Shore the right to do so. However, "selection agreements" have been upheld as enforceable despite the statute of frauds. *See, e.g., Stekoll Petroleum Co. v. Hamilton*, 255 S.W.2d 187, 190 (Tex. 1952); *Eland*

---

[15] North Shore notes that paragraph 14 of the Option Agreement, quoted above, explicitly mentions that there is an "Oil, Gas, and Mineral Lease covering part of Said Land"; and that, while the Hamman Lease had expired at the time the Option Agreement was entered into, there were two other tracts within "Tract 2" that had active oil and gas leases still in effect at that time. According to North Shore, this is why the Option Agreement only gave it the right to select 1,210.8824 out of 1,673.69 total acres in "Tract 2."

*Energy, Inc. v. Rowden Oil & Gas, Inc.*, 914 S.W.2d 179, 182 (Tex. App.—San Antonio 1995, writ denied); *Best Bldg. Co. v. Sikes*, 394 S.W.2d 57, 62 (Tex. Civ. App.—Fort Worth 1965, writ ref'd n.r.e.) ("It appears that existence in one party of an unqualified right of determination or selection of an amount and location of premises (within an area certainly ascertainable) meets the requirements of the Statute of Frauds where there is no necessity of any further agreement or approval by the other party."). Harkins and Dynamic note that the cases in which "selection agreements" have been upheld largely involve contracts expressly and explicitly giving the grantee the right to select acreage to lease or purchase, and they cite several cases establishing that "a contract providing for the sale or lease of an unidentified portion of a larger, identifiable tract is not sufficient under the statute of frauds." *See Tex. Builders v. Keller*, 928 S.W.2d 479, 482 (Tex. 1996); *Morrow v. Shotwell*, 477 S.W.2d 538, 539–40 (Tex. 1972); *see also Lumbreras v. Rocha*, 13-10-00459-CV, 2012 WL 29215 (Tex. App.—Corpus Christi Jan. 5, 2012, no pet.) (mem. op.). However, Harkins and Dynamic do not cite case law specifically indicating that a "selection agreement"—that is, an agreement granting a party the right to select which part of a larger parcel of property it will lease or buy—cannot be found by implication.[16] In other words, when an agreement purports to grant a specific parcel of land to convey, that agreement must explicitly identify the land to which it applies, *see, e.g., Tex. Builders,* 928 S.W.2d at 482; but an agreement granting a party the right to select certain acreage out of a larger parcel need not contain explicit "selection language."

---

[16] The parties do not dispute that the Option Agreement explicitly gave North Shore the right to select the portions of Tract 2 that it wished to lease. The issue we discuss here is whether it is reasonable to interpret the Option Agreement as granting North Shore the right to select which 1,210.8224 acres (out of the 1,673.69 total acres described in the Export Lease) comprised Tract 2; that is, whether North Shore had the right to choose which land was optioned.

Instead, consistent with the general rule governing contracts, such an agreement may be found by implication. *See, e.g., Harrison v. Williams Dental Group, P.C.*, 140 S.W.3d 912, 916 (Tex. App.—Dallas 2004, no pet.) ("[A]n implied contract can arise from the acts and conduct of the parties.") (citing *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972)). Moreover, it is a rule of construction of deeds that they are to be most strongly construed against the grantor and in favor of the grantee, and this rule applies to reservations and exceptions. *See Commerce Trust Co. v. Lyon*, 284 S.W.2d 920, 921 (Tex. Civ. App.—Fort Worth 1955, no writ); *see also Gonyea v. Kerby*, No. 10-12-00182-CV, 2013 WL 4040117, at *3 (Tex. App.—Waco Aug. 8, 2013, pet. denied) (mem. op.). We do not believe that North Shore's interpretation of the Option Agreement would render the agreement void under the statute of frauds, and we disagree with appellants' contention that North Shore's interpretation is unreasonable for that reason.

Because the Option Agreement is capable of more than one reasonable interpretation, it is ambiguous. *See Milner*, 361 S.W.3d at 619. "When a contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument is a question of fact for the jury." *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 529 (Tex. 1987); *Barrand, Inc. v. Whataburger, Inc.*, 214 S.W.3d 122, 129 (Tex. App.—Corpus Christi 2006, pet. denied).[17] We therefore conclude that

---

[17] We note that North Shore may have been entitled to judgment as a matter of law if: (1) it established through extrinsic evidence that the parties intended, despite the ambiguous nature of the property description, to include the 400.15-acre Hamman Lease tract as part of the area optioned to North Shore; and (2) Harkins and Dynamic then failed to produce evidence raising an issue of material fact as to that intention. *See* Tex. R. Civ. P. 166a(c). However, North Shore did not argue in its summary judgment pleadings that the agreement was ambiguous or that extrinsic evidence as to the parties' intent established its entitlement to judgment on this issue. Accordingly, we may not affirm the summary judgment rulings on this basis. *See id.*; *Travis v. City of Mesquite*, 830 S.W.2d 94, 100 (Tex. 1992) ("A summary judgment cannot be affirmed on a ground not specifically presented in the motion for summary judgment.").

20

the trial court erred by granting partial summary judgment in favor of North Shore and that it did not err by denying Harkins's and Dynamic's motions for summary judgment. Harkins's first issue is sustained in part and overruled in part. Dynamic's first issue is sustained and its second issue is overruled.

## B. Other Issues

The other issues raised by Harkins and Dynamic on appeal challenge aspects of the trial court's judgment based on trial proceedings which, in turn, were based at least in part on the erroneous summary judgment rulings.[18] Accordingly, we do not address these issues. *See* TEX. R. APP. P. 47.1.

### III. CONCLUSION

We reverse the trial court's judgment and remand the cause for further proceedings consistent with this memorandum opinion. *See* TEX. R. APP. P. 43.3.

DORI CONTRERAS GARZA,
Justice

Delivered and filed the
1st day of May, 2014.

---

[18] In particular, Harkins argues by his second issue that North Shore did not have an exclusive right to conduct oil and gas exploration on the land at issue, and he argues by his third issue that the trial court erred in rendering judgment ordering Harkins to pay North Shore's attorney's fees. Dynamic argues by its third, fourth, and fifth issues that the trial evidence was insufficient to support North Shore's tortious interference with contract claim; by its sixth and eighth issues that the trial evidence was insufficient to support lost profits damages; by its seventh issue that North Shore did not have an exclusive right to conduct oil and gas exploration on the land at issue; by its ninth issue that the trial court erred by awarding damages to North Shore representing both (1) the market value of seismic testing done by Dynamic and (2) the market value of the processed seismic data; by its tenth issue that the trial evidence was insufficient to support exemplary damages; by its eleventh issue that the trial court erred in omitting from the jury charge questions and instructions related to its justification and failure-to-mitigate defenses; by its twelfth issue that the trial court erred "in discussing, and in allowing North Shore to discuss, the summary judgment rulings in witness examinations, jury arguments, and charge instructions"; and by its thirteenth issue that North Shore's expert testimony regarding seismic exploration damages was incompetent and inadmissible.

21