# IN THE SUPREME COURT OF TEXAS

════════════
No. 14-0552
════════════

NORTH SHORE ENERGY, L.L.C., PETITIONER,

v.

JOHN JAMES HARKINS, ET AL., RESPONDENTS

════════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS
════════════════════════════════════════════════════════

**PER CURIAM**

This case involves the interpretation of an option contract between landowners and an oil and gas company. The parties disagree on the interpretation of the land description in the contract. The landowners contend that the description excluded a 400-acre tract, and the oil and gas company argues that the description included the tract. The trial court held for the oil and gas company on summary judgment. The court of appeals reversed, holding that the contract was ambiguous, and therefore, the interpretation of the description was an issue of fact. ___ S.W.3d ___, ___. We, however, hold that the description is not ambiguous and interpret the description in favor of the landowners. Accordingly, we affirm the part of the court of appeals' judgment that reversed the trial court's summary judgment order, but we do so on different grounds. We also affirm the court of appeals' remand, but for further proceedings consistent with this Court's opinion.

In June 2009, the Harkins family[1] granted North Shore Energy the exclusive option to select land from a described tract on which to execute oil and gas leases. North Shore drafted an agreement (the Option Agreement), under which North Shore had the option to select multiple parcels of land to lease, each containing at least 160 acres. As consideration, North Shore paid $50 per acre optioned and agreed to pay an additional $200 per acre on the land it selected to lease. In describing the optioned land, the Option Agreement states that it covers "[a]ll that certain property more fully described on EXHIBIT 'A,'" which is attached to the agreement. Exhibit A references two tracts of land, but the tract relevant to this case is "Tract 2," described as:

> Being 1,210.8224 acres of land, more or less, out of the 1673.69 acres out of the Caleb Bennet Survey, A-5, Goliad County, Texas and being the same land described in that certain Memorandum of Oil and Gas Lease dated March 14, 1996 from The Estate of Janie Francis Harkins, Deceased, to Export Petroleum Corporation and being recorded in Volume 50 at Page 454 of the Official Public Records of Goliad County, Texas to which deed reference is here made for a more complete description of said land.

The Memorandum of Oil and Gas Lease (the Export Lease) referenced in the Exhibit A description describes the land as:

> Being 1273.54 acres situated in Goliad County, Texas, and being all of the 1673.69 acre tract described on EXHIBIT "A" attached hereto, SAVE AND EXCEPT a 400.15 acre tract described in a Memorandum of Oil and Gas Lease between the Estate of Janie Francis Harkins, deceased, and Hammon [sic] Oil & Refining, dated March 13, 1995, recorded in Volume ___, Page ___, of the Public Records of Goliad County, Texas.

---

[1] The seven-member Harkins family includes John James Harkins, Dolores Marie Harkins, Janey Frances Harkins Hiller, Allen Anthony Harkins, Patricia Ailene Harkins, Wilson William Harkins IV, and Heath Alan Harkins (collectively, the Harkins family).

At the time the Export Lease was executed, the agreement leasing land to Hamman Oil & Refining (the Hamman Lease) was still effective. Neither party disputes that the Hamman Lease had expired by June 2009 when North Shore and the Harkins family entered into the Option Agreement.[2]

In September 2009, North Shore exercised its option to lease 169.9 acres, notified the Harkins family that it was exercising its option, and paid the agreed consideration of $200 per acre.[3] North Shore, however, did not execute a formal lease with the Harkins family for that specific acreage because a purported lease was attached to the Option Agreement. The 169.9 acres North Shore decided to lease contained a large portion of the Hamman Lease tract, and the well that North Shore drilled on its selected acreage, NSE-Harkins Well No. 1, was on the Hamman Lease tract.

When the well began to produce oil, North Shore obtained a pipeline easement from two members of the seven-member Harkins family to connect the well to an outside pipeline. Several months later, Dynamic Production Inc. contacted North Shore in an effort to negotiate a deal for Dynamic to "shoot seismic" across North Shore's optioned acreage. North Shore, however, turned down Dynamic's offer. After Dynamic's attorneys reviewed the Option Agreement, Dynamic determined that North Shore did not have the right to lease the land on which NSE-Harkins Well No. 1 was located. At that time, Dynamic approached the Harkins family and offered to lease the 400-acre Hamman Lease tract, including NSE-Harkins Well No. 1, and told the Harkins family that North Shore did not own the well.

---

[2] The well drilled and operated under the Hamman Lease was plugged in January 1998.

[3] The Harkins family states that North Shore sent them a letter informing them that it was going to lease 169.9 acres of the optioned tract but did not inform them which 169.9 acres it was leasing. North Shore does not dispute this statement, but we have not reviewed the letter because it is not in the record.

After separate negotiations with Dynamic and North Shore, the Harkins family leased the 400-acre Hamman Lease tract to Dynamic because Dynamic "had a better offer." Specifically, Dynamic offered to increase the percentage of royalties paid to the Harkins family and offered to pay the Harkins family more per mineral acre for the lease.

North Shore then sued the Harkins family and Dynamic to quiet title to the Hamman Lease tract and for reformation of the Option Agreement to include the Hamman Lease tract. The Harkins family and Dynamic counterclaimed, alleging trespass, tortious interference with contract, and conversion. Soon after, North Shore determined that the Option Agreement included the Hamman Lease tract, amended its petition accordingly, rescinding its request for reformation and seeking specific performance of the Option Agreement and damages resulting from Dynamic's geophysical trespass and tortious interference with the Option Agreement.

Both sides filed motions for summary judgment. The trial court denied the Harkins family's and Dynamic's motion for summary judgment. The trial court granted North Shore's motion for summary judgment to remove Dynamic's lease on the Hamman Lease tract as a cloud on North Shore's title and ordered the Harkins family to deliver the oil and gas lease on the 169.9 acres selected under the Option Agreement.

The case then proceeded to a jury trial on North Shore's tortious interference and geophysical trespass claims against Dynamic. The trial court instructed the jury that the Option Agreement was valid and included the Hamman Lease tract. The jury found that Dynamic tortiously interfered with the Option Agreement. The trial court therefore rendered judgment against the Harkins family and Dynamic and ordered the Harkins family to pay $405,338 in attorney's fees and Dynamic to pay

4

$709,050 in actual damages and $1,148,000 in punitive damages. The Harkins family and Dynamic appealed.

On appeal, the Harkins family and Dynamic argued that the trial court erred in granting summary judgment in favor of North Shore. The court of appeals originally affirmed the trial court's judgment, holding that the Option Agreement was ambiguous but that North Shore met its summary judgment burden to prove that, despite the ambiguity, the parties intended to include the Hamman Lease tract in the Option Agreement.[4] On rehearing, however, the court of appeals reversed the trial court's judgment. ___ S.W.3d at ___. While it still held that the Option Agreement was ambiguous, the court of appeals on rehearing held that the trial court erred in granting summary judgment. *Id.* at ___. The court of appeals remanded the case to the trial court for further proceedings consistent with its opinion. *Id.* at ___. North Shore, the Harkins family, and Dynamic appealed.

"Deciding whether a contract is ambiguous is a question of law for the court." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). Our primary concern is to determine the true intent of the parties as expressed by the plain language of the agreement. *Id.* "We 'construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served,' and avoiding unreasonable constructions when possible and proper." *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015) (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)). "A contract is not ambiguous if the contract's language can be given a certain or definite meaning." *Id.* "On the other hand, a contract is

---

[4] *Harkins v. N. Shore Energy, L.L.C.*, No. 13-12-00504-CV, 2013 Tex. App. LEXIS 14929, at *30–31 (Tex. App.—Corpus Christi–Edinburg Dec. 12, 2013) (mem. op.), *withdrawn, reh'g granted in part*, ___ S.W.3d ___.

5

ambiguous if it is susceptible to more than one reasonable interpretation." *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam). An ambiguity, however, does not arise "merely because parties to an agreement proffer different interpretations of a term." *DeWitt Cty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999). "For an ambiguity to exist, both interpretations must be *reasonable*." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996).

Here, North Shore disagrees with the Harkins family and Dynamic about whether the description of land in the Option Agreement includes the 400-acre Hamman Lease tract. North Shore argues that the Option Agreement gave it the right to lease any 1,210.8224 acres out of the described 1,673.69-acre tract, making it a selection agreement, which is a common, valid, and enforceable form of real property conveyance. Under North Shore's interpretation, the Export Lease describes the 1,673.69 acres of the parent tract, so North Shore had the right to choose to lease any 1,210.8224 acres out of that *described* tract. Dynamic, however, argues that the express language of the Option Agreement clearly excludes 400.15 acres from the 1,673.69-acre parent tract because the Export Lease uses the words "SAVE AND EXCEPT." We must look to the reasonableness of each party's interpretation to determine whether an ambiguity exists. *See Frost Nat'l Bank*, 165 S.W.3d at 312–13.

"[T]he contract may be read in light of the circumstances surrounding its execution to determine whether an ambiguity exists." *Plains Expl. & Prod. Co.*, 473 S.W.3d at 305. Here, the circumstances surrounding execution include the amount paid for the optioned acreage. Under the Option Agreement, North Shore was optioning two tracts of land. Tract 1 is described in Exhibit

6

A to the Option Agreement as "[b]eing 1,675.334 acres of land, more or less, out of the 1,855.52 acres out of the James and Patrick Bray Survey." Tract 2 is described as "[b]eing 1210.8224 acres of land, more or less, out of the 1673.69 acres out of the Caleb Bennet Survey . . . and being the same land described in [the Export Lease]." To secure its option under the agreement, North Shore paid $50 per optioned acre. In total, North Shore paid $144,307.82. This amount correlates to $50 per acre for 2,886.1564 acres. The acreage described in Tract 1 (1,675.334 acres) and the acreage described in Tract 2 (1,210.8224 acres) add up to 2,886.1564 acres exactly. Therefore, North Shore only paid for an option on 1,210.8224 acres out of Tract 2. In her affidavit, Catherine Schaper, North Shore's principal, explicitly states that North Shore only paid to option 1,210.8224 acres out of Tract 2. We conclude that North Shore only optioned 1,210.8224 acres out of Tract 2, and its option did not include the entire 1,673.69 acre tract. North Shore cannot successfully claim that all 1,673.69 acres of the parent tract are subject to the option when it did not pay to tie up all 1,673.69 acres.

North Shore argues, however, that the Option Agreement is a legally enforceable selection agreement that allows it to choose up to 1,210.8224 acres to lease out of the 1,673.69-acre parent tract. Under North Shore's interpretation, because it paid for only 1,210.8224 acres, it could not choose more than that amount to lease. North Shore is correct that selection agreements are valid and enforceable under Texas law. *See Williams v. Ellison*, 493 S.W.2d 734, 738 (Tex. 1973) ("A contracting party well may enforce an otherwise valid option providing for the selection of property from a larger definitely described tract . . . ."). It is also correct that the Option Agreement with the Harkins family is a selection agreement. The Option Agreement, however, does not give North

7

Shore the option to choose any desired 1,210.8224 acres out of the 1,673.69-acre parent tract, as North Shore argues. It is a selection agreement that allows North Shore to choose one or many parcels of at least 160 acres out of the described 1,210.8224-acre tract. The fact that the Option Agreement requires North Shore to pay an additional $200 per acre for each acre it decides to lease directly contradicts North Shore's interpretation.

Furthermore, North Shore's interpretation of the Option Agreement flies in the face of our rules of construction. North Shore argues that, under the doctrine of last antecedent, the second clause in the description of Tract 2—"and being the same land described in [the Export Lease]"—modifies "1673.69 acres out of the Caleb Bennett Survey." Under the doctrine of last antecedent, "a qualifying phrase must be confined to the words and phrases immediately preceding it to which it may be applied without impairing the meaning of the sentence." *City of Corsicana v. Willmann*, 216 S.W.2d 175, 176 (Tex. 1949). North Shore's interpretation, however, would impair the meaning of the sentence. The entire description is as follows:

> Being 1,210.8224 acres of land, more or less, out of the 1673.69 acres out of the Caleb Bennet Survey, A-5, Goliad County, Texas and being the same land described in [the Export Lease] and being recorded in Volume 50 at Page 454 of the Official Public Records of Goliad County, Texas to which deed reference is here made for a more complete description of said land.

The two disputed clauses of the description both begin with the word "being." Under the Harkins family's and Dynamic's interpretation, the clauses are correlative pairs that refer to the same object described—the 1,210.8224 acres of land. Their interpretation is further supported by the use of the word "and" before the second clause. "And" is a conjunction that means "along with or together

8

with." *And*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 80 (2002). Its use in this context points strongly, if not conclusively, to the Harkins family's and Dynamic's interpretation.

North Shore argues that the difference in acreage between the description in the Export Lease and the description in Exhibit A to the Option Agreement makes the Harkins family's and Dynamic's interpretation unreasonable. The Export Lease describes the land as "[b]eing 1273.54 acres . . . and being all of the 1673.69 acre tract described . . . SAVE AND EXCEPT a 400.15 acre tract described in [the Hamman Lease]." Slight differences in acreage when the description uses the phrase "more or less" will not preclude an interpretation of the description to include the larger acreage. *Cf. Stribling v. Millican DPC Partners, LP*, 458 S.W.3d 17, 21–22 (Tex. 2015) (per curiam). As we recognized in *Stribling*, "[t]he call for acreage . . . 'is the least reliable of all calls in a deed.'" *Id.* (quoting *Tex. Pac. Coal & Oil Co. v. Masterson*, 334 S.W.2d 436, 439 (Tex. 1960)). Therefore, a difference of 62.7176 acres between the acreage described in the Option Agreement and the acreage described in the Export Lease will not render the Harkins family's and Dynamic's interpretation unreasonable.

Despite North Shore's arguments, the Harkins family's and Dynamic's interpretation of the Option Agreement is the only reasonable interpretation. Looking to the text of the description in the Option Agreement, it refers specifically to the Export Lease to further describe the land that is being optioned. The Export Lease then explicitly excludes the 400-acre Hamman Lease tract from its description of the 1,273.54-acre tract. North Shore argues that the Export Lease was only referred to in the Option Agreement to further describe the 1,673.69-acre parent tract. North Shore, however, cannot ignore the express language of the Export Lease that explicitly describes 1,273.54 acres as

"being all of the 1673.69 acre tract . . . SAVE AND EXCEPT a 400.15 acre tract described in [the Hamman Lease]." The Export Lease describes the 1,273.54-acre tract, not the 1,673.69-acre tract; interpreting the description any other way would ignore a large portion of the description's language. *See J.M. Davidson, Inc.*, 128 S.W.3d at 229 ("[W]e must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." (citing *Universal C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 158 (Tex. 1951))).

Because the plain and express language of the Option Agreement specifically excludes the 400-acre Hamman Lease tract, the Harkins family's and Dynamic's interpretation is reasonable. North Shore's interpretation is unreasonable because it requires the Court to ignore the plain language of the Option Agreement. Therefore, because there is only one reasonable interpretation of the Option Agreement, the Option Agreement is not ambiguous. *See Columbia Gas Transmission Corp.*, 940 S.W.2d at 589 ("A contract is not ambiguous if it can be given a definite or certain meaning as a matter of law."). As a result, we hold that the Option Agreement excluded the 400-acre Hamman Lease tract from the optioned acreage as a matter of law.

Additionally, the Harkins family and Dynamic argue that North Shore's other claims must fail because the Option Agreement excluded the 400-acre Hamman Lease tract. The trial court ordered the Harkins family to pay damages for breach of contract and attorney's fees and Dynamic to pay damages for tortious interference and geophysical trespass. Because we hold that the Option Agreement was not ambiguous and excluded the 400-acre Hamman Lease tract as a matter of law, we must also hold that the Harkins family is not liable for breach of contract or attorney's fees based

10

on North Shore's breach of contract claim. Also, because North Shore did not have a right to the 400-acre Hamman Lease tract, Dynamic cannot be liable for tortious interference for taking a lease on the 400-acre tract. As a result, North Shore's claims for breach of contract, attorney's fees, and tortious interference fail, leaving its claim against Dynamic for geophysical trespass.

Trespass is the "unauthorized entry upon the land of another." *Envtl. Processing Sys., L.C. v. FPL Farming Ltd.*, 457 S.W.3d 414, 424 (Tex. 2015) (quoting *Barnes v. Mathis*, 353 S.W.3d 760, 764 (Tex. 2011) (per curiam)). Trespass "may occur when one enters—or causes something to enter—another's property." *Barnes*, 353 S.W.3d at 764. To prove a trespass claim, the plaintiff must show that it owned the property or had a right to exclude others from the property. *See Envtl. Processing Sys.*, 457 S.W.3d at 424 (recognizing in the trespass context that owners of real property have the right to exclude others from that property). Several courts have recognized that "the right to explore for oil and minerals is a valuable property right that can be legally protected." *E.g.*, *Phillips Petroleum Co. v. Cowden*, 241 F.2d 586, 590 (5th Cir. 1957); *accord Wilson v. Tex. Co.*, 237 S.W.2d 649, 650 (Tex. Civ. App.—Fort Worth 1951, writ ref'd n.r.e.) ("We recognize the right to enter upon lands of another for the purpose of making geophysical surveys . . . is a valuable property right which belongs exclusively to the owner of land or minerals and that an unauthorized invasion would render the invader a trespasser and liable for damages . . . .").

Neither party disputes that Dynamic conducted a seismic survey over the two tracts of optioned land during the option period. All parties also agree that Dynamic had permission from the Harkins family to conduct the survey. We are left to determine whether North Shore had a right to

11

exclude Dynamic from conducting a seismic survey on the land that would give North Shore standing to sue for geophysical trespass.

Under the Option Agreement, the Harkins family granted to North Shore the "exclusive option to acquire oil and gas leases on all or a portion of Said Land under the terms and provisions of that certain Oil and Gas Lease form set forth on Exhibit 'B.'" The lease form attached to the Option Agreement would grant North Shore the exclusive right to investigate, explore, prospect, drill, mine for, and produce oil and gas on the land described in Exhibit A, which would be attached when North Shore executed its option. North Shore, however, never executed that lease.

An option agreement does not pass title or convey an interest in property. *E.g.*, *Knox v. Brown*, 277 S.W. 91, 94 (Tex Comm'n App. 1925, judgm't adopted); *Roberts v. Armstrong*, 231 S.W. 371, 374 (Tex. Comm'n App. 1921, holding approved, judgm't adopted); *Dittman v. Cerone*, No. 13-11-00196-CV, 2013 WL 5970356, at *11 (Tex. App.—Corpus Christi–Edinburg Oct. 31, 2013, no pet.) (mem. op.); *Click v. Seale*, 519 S.W.2d 913, 918 (Tex. Civ. App.—Austin 1975, writ ref'd n.r.e.). It merely gives the optionee the option to purchase property or execute a lease within a certain time period. *Knox*, 277 S.W. at 94; *Faucette v. Chantos*, 322 S.W.3d 901, 907 (Tex. App.—Houston [14th Dist.] 2010, no pet.). "An option contract has two components: (1) an underlying contract that is not binding until accepted and (2) a covenant to hold open to the optionee the opportunity to accept." *Faucette*, 322 S.W.3d at 908.

Here, the underlying contract is the oil and gas lease attached to the Option Agreement as Exhibit B. Because North Shore did not execute the lease attached to the Option Agreement, it acquired neither possession nor title to the optioned land; it simply had a right to execute a lease

12

during the option period. *See Knox*, 277 S.W. at 94. While oil and gas leases generally include the right to explore for minerals, the Option Agreement did not explicitly grant North Shore the exclusive right to explore the optioned land. North Shore, therefore, did not have an exclusive right to explore the land or exclude others from exploring the land before it exercised its option. Furthermore, because an option contract does not grant possession or title to property, even if the Option Agreement had granted North Shore the exclusive option to explore the land, North Shore would not have standing to sue Dynamic for trespass because North Shore does not have a possessory interest in the land via the Option Agreement. *See Knox*, 277 S.W. at 94; *Faucette*, 322 S.W.3d at 307–08.

In conclusion, North Shore's interpretation of the Option Agreement is not reasonable. Because the Harkins family's and Dynamic's interpretation is the only reasonable interpretation, the court of appeals erred in holding that the Option Agreement was ambiguous. Therefore, without hearing oral argument, TEX. R. APP. P. 59.1, we affirm the court of appeals' judgment reversing the trial court's summary judgment order, but on different grounds, and we affirm the court of appeals' remand to the trial court, but for further proceedings consistent with this opinion.

OPINION DELIVERED: October 28, 2016

13