# IN THE SUPREME COURT OF TEXAS

══════════

No. 18-0581

══════════

PIRANHA PARTNERS, RANDOLPH MUNDT, AND THOMAS H. OWEN, JR., INDIVIDUALLY AND AS PARTNERS OF PIRANHA PARTNERS, AND CHARLES RAY OWEN, PETITIONERS,

v.

JOE B. NEUHOFF AND NANCY M. NEUHOFF; THOMAS H. NEUHOFF AND JUDY A. NEUHOFF; ROBERT V. NEUHOFF AND ANDREA D. NEUHOFF; AND BOCA VAIL, INC., RESPONDENTS

══════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SEVENTH DISTRICT OF TEXAS

══════════════════════════

**Argued November 6, 2019**

JUSTICE BOYD delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE GUZMAN, JUSTICE DEVINE, JUSTICE BLACKLOCK, AND JUSTICE BUSBY joined.

JUSTICE BLAND filed a dissenting opinion, in which JUSTICE LEHRMANN joined.

This case involves a written assignment of an overriding royalty interest in minerals produced from land in Wheeler County. The assignment identifies the single well that was producing at the time of the assignment, the land on which that well is located, and the lease under which the overriding royalty interest exists. The issue is whether the assignment conveyed the assignor's interest only in production from the identified well, in production from any well drilled on the identified land, or in all production under the identified lease. Rejecting inapplicable rules

of construction and finding no reliable guidance from the surrounding facts and circumstances, we construe the assignment in its entirety and conclude that it unambiguously conveyed the assignor's overriding royalty interest in all production under the lease. We reverse the court of appeals' judgment and reinstate the trial court's summary judgment.

## I.
## Background

In 1975, Neuhoff Oil & Gas purchased an undivided two-thirds interest in a mineral lease known as the Puryear Lease. The lease—between the Puryears (and others) as lessors and Marie Lister as lessee—covered all of the minerals under a tract of land referred to as Section 28.[1] A few years later, Neuhoff Oil sold and assigned its two-thirds interest but reserved for itself a 3.75% overriding royalty interest on all production under the Puryear Lease.[2]

From 1975 through 1999, only one well was completed on Section 28. That well, named the Puryear B #1-28, was located in the section's northwest quarter. Neuhoff Oil received royalty payments on production from the Puryear B #1-28 until 1999, when it sold its overriding royalty interest along with several other mineral interests through an auction. Piranha Partners was the successful bidder. To effectuate the sale, Neuhoff Oil and Piranha executed a written agreement

---

[1] The Puryear Lease reserved a 3/16 royalty interest to the lessors.

[2] An overriding royalty interest is a non-participating interest in the oil and gas produced at the surface, free of production expenses, carved out of the working interest under a mineral lease. *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 714 n.9 (Tex. 2016); *Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 372 S.W.3d 177, 180 n.1 (Tex. 2012); *Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 155 (Tex. 2004). It derives from and burdens the lease, and absent agreement otherwise, terminates when the lease itself terminates. *See Apache Deepwater, LLC v. McDaniel Partners, Ltd.*, 485 S.W.3d 900, 905 (Tex. 2016). Because its validity depends on the lease, "one of the most essential elements of a contract for the conveyance of such an overriding royalty interest is a description of the lease from which it comes; for it is the lease which denotes the life and breadth of the estate to be assigned." *Gruss v. Cummins*, 329 S.W.2d 496, 501 (Tex. Civ. App.—El Paso 1959, writ ref'd n.r.e.).

entitled "Assignment of Overriding Royalty Interests and Oil and Gas Leases." The following year, Neuhoff Oil went out of business and assigned all of its remaining assets to individual members of the Neuhoff family.[3]

After 1999, the operator under the Puryear Lease paid the 3.75% overriding royalty on production from the Puryear B #1-28 to Piranha. Over time, the operator drilled additional wells on Section 28, including at least one other in the section's northwest quarter. The operator paid a 3.75% overriding royalty on production from these new wells to the Neuhoffs, believing Neuhoff Oil had conveyed to Piranha only the overriding royalty interest in production from the Puryear B #1-28, not in all production from Section 28's northwest quarter or under the Puryear Lease. In 2012, however, the operator obtained title opinions concluding that Piranha owned the overriding royalty interest on all production under the Puryear Lease, and not just production from the Puryear B #1-28. Based on these opinions, the operator retroactively paid Piranha the overriding royalty on all Section 28 wells and demanded a refund of the amounts it had paid the Neuhoffs.

The Neuhoffs filed this suit, claiming Neuhoff Oil assigned to Piranha its overriding royalty only in production from the Puryear B #1-28. On summary-judgment cross-motions, the trial court sided with Piranha, declaring that Neuhoff Oil sold the overriding royalty on all production under the Puryear Lease, which covered all of Section 28.[4] The court of appeals

---

[3] Following the death of one Neuhoff family member, an entity known as Boca Vail acquired a portion of Neuhoff Oil's assets.

[4] The trial court actually granted a motion for partial summary judgment, but it severed all remaining claims, counterclaims, and defenses into a separate case, making this judgment final, and then abated the severed case pending the resolution of this appeal.

disagreed with the trial court, but it also disagreed with the Neuhoffs. It held that Neuhoff Oil sold the overriding royalty in production not from all of Section 28, and not just from the Puryear B #1-28, but from all of the northwest quarter of Section 28. *Neuhoff v. Piranha Partners*, 578 S.W.3d 543, 551–52 (Tex. App.—Amarillo 2018). We granted Piranha's petition for review. The Neuhoffs—content to give up any interest in production from any wells on Section 28's northwest quarter—did not file a cross-petition.

## II.
## The Assignment

We must construe the written Assignment of Overriding Royalty Interests and Oil and Gas Leases through which Neuhoff Oil assigned its interests to Piranha following the 1999 auction. As with any deed or contract, our task is to determine and enforce the parties' intent as expressed within the four corners of the written agreement. *Perryman v. Spartan Tex. Six Capital Partners, Ltd.*, 546 S.W.3d 110, 117–18 (Tex. 2018).[5] We must first determine whether the Assignment is ambiguous, considering its language as a whole in light of well-settled construction principles and the relevant surrounding circumstances. *URI*, 543 S.W.3d at 763; *First Bank v. Brumitt*, 519

---

[5] *See also Murphy Expl. & Prod. Co.-USA v. Adams*, 560 S.W.3d 105, 108 (Tex. 2018); *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 757 (Tex. 2018); *Wenske v. Ealy*, 521 S.W.3d 791, 794 (Tex. 2017); *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017); *N. Shore Energy, L.L.C. v. Harkins*, 501 S.W.3d 598, 602 (Tex. 2016); *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011); *Luckel v. White*, 819 S.W.2d 459, 461–62 (Tex. 1991); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 727–28 (Tex. 1981 ); *Citizens Nat'l Bank in Abilene v. Tex. & P. Ry. Co.*, 150 S.W.2d 1003, 1006 (Tex. 1941).

4

S.W.3d 95, 109 (Tex. 2017).[6] Whether the agreement is ambiguous is a question of law that we decide de novo. *URI*, 543 S.W.3d at 763.[7]

That the parties interpret an agreement differently does not make it ambiguous; ambiguity exists only if both parties' interpretations are reasonable. *Id.* at 763, 765. But it does not exist if the agreement's language creates a definite or certain legal meaning. *Id.* at 765.[8] If we conclude the agreement is ambiguous, we must remand for a jury to determine its meaning as a factual issue; but if it is unambiguous, we will determine its meaning as a matter of law. *Id.* at 763, 766; *Coker*, 650 S.W.2d at 393–94. In doing so, we look not for the parties' actual intent but for their intent as expressed in the written document. *Luckel*, 819 S.W.2d at 461–62.[9] We consider the entire agreement and, to the extent possible, resolve any conflicts by harmonizing the agreement's provisions, rather than by applying arbitrary or mechanical default rules. *Wenske*, 521 S.W.3d at 792, 796.[10]

---

[6] *See also Coker*, 650 S.W.2d at 393–94.

[7] *See also Harkins*, 501 S.W.3d at 602; *Coker*, 650 S.W.2d at 394.

[8] *See also Brumitt*, 519 S.W.3d at 105; *Primo*, 512 S.W.3d at 893; *Harkins*, 501 S.W.3d at 602; *Apache Deepwater*, 485 S.W.3d at 904; *FPL Energy, LLC v. TXU Portfolio Mgmt. Co., L.P.*, 426 S.W.3d 59, 63 (Tex. 2014); *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London,* 327 S.W.3d 118, 133 (Tex. 2010); *Coker*, 650 S.W.2d at 393–94; *Sun Oil*, 626 S.W.2d at 727.

[9] *See also Apache Deepwater*, 485 S.W.3d at 906.

[10] *See also Hysaw v. Dawkins*, 483 S.W.3d 1, 4 (Tex. 2016); *FPL Energy*, 426 S.W.3d at 63; *Concord Oil Co. v. Pennzoil Expl. & Prod. Co.*, 966 S.W.2d 451, 457 (Tex. 1998); *Luckel*, 819 S.W.2d at 462; *Coker*, 650 S.W.2d at 393; *Citizens Nat'l Bank*, 150 S.W.2d at 1006.

### A. The Granting Clause

We begin with the Assignment's granting clause, which appears within the introductory paragraph of Section I and provides:

> [Neuhoff Oil] does hereby assign, sell and convey unto [Piranha] . . . without warranty or covenant of title, express or implied, subject to the limitations, conditions, reservations and exceptions hereinafter set forth . . . all of [Neuhoff Oil's] right, title and interest in and to the properties described in Exhibit "A" (the "Properties").

This clause does not describe the interest being assigned, but instead incorporates the description provided in a document attached as Exhibit A. Following this introductory paragraph, but still within Section I, are two numbered paragraphs. Paragraph 1 of Section I also incorporates the description in Exhibit A:

> All oil and gas leases, mineral fee properties or other interests, INSOFAR AND ONLY INSOFAR AS set out in Exhibit A . . . whether said interest consists of leasehold interest, overriding royalty interest, or both . . . .

So the Assignment requires us to look to Exhibit A to determine what interest was assigned. Exhibit A, however, is not particularly helpful.

### B. Exhibit A

The document attached to the Assignment as Exhibit A consists of two pages. Only the second page relates to Neuhoff Oil's interest in the Puryear Lease and the Puryear B #1-28 well. The entirety of its description appears as follows:

<u>Lands and Associated Well(s)</u>:      Puryear #1-28
Wheeler County, Texas
NW/4, Section 28, Block A-3, HG&N Ry Co. Survey

<u>Oil and Gas Lease(s)/Farmout Agreement(s)</u>:

```
                        Oil & Gas Lease(s)
                        Lessor:        [the Puryears]
                        Lessee:        Marie Lister
                        Recorded:      Volume 297, Page 818
```

The first part of this description, addressing the "Lands and Associated Well(s)," identifies

the well that existed on Section 28 at the time of the assignment ("Puryear #1-28")[11] and the portion

of the "land" on which that well was located ("NW/4, Section 28"). The second part, addressing

"Oil and Gas Lease(s)/Farmout Agreement(s)," identifies the "lease" under which Neuhoff Oil

owned its 3.75% overriding royalty interest (the Puryear lease).[12] The issue is whether the

Assignment conveys Neuhoff Oil's overriding royalty interest in minerals produced by the well,

from the land, or under the lease. In other words, which of the three identifies the "Properties" the

Assignment conveys?

---

[11] Although Exhibit A identifies the well as the "Puryear #1-28," omitting the "B," the parties do not dispute that it refers to the "Puryear B #1-28."

[12] The Neuhoffs note that the Puryear Lease is recorded at page 818 of volume 247, not 297, of the Wheeler County property records. The document filed at page 818 of volume 297 does not relate to the Puryear Lease or to those parties at all. Piranha suggests that this was a "mere scrivener's error," and the Neuhoffs do not disagree. When part of a deed's property description is incorrect, we will disregard that part "as surplusage" and enforce the deed if the remainder of the description identifies the land with sufficient certainty. *Reserve Petroleum Co. v. Harp*, 226 S.W.2d 839, 841 (Tex. 1950); *see also Henderson v. Gunter*, 328 S.W.2d 868, 870 (Tex. 1959) ("These mistakes will be corrected so as to carry out the true intention of the grantor as revealed from a reading of the instrument as a whole."). Both parties agree that Exhibit A identifies the Puryear Lease, although the Neuhoffs note that we must read the Oil and Gas Lease(s)/Farmout Agreement(s) section together with the Lands and Associated Well(s) section to reach that conclusion. We agree that, reading all of the language together, Exhibit A sufficiently establishes that the parties intended to identify the Puryear Lease, the Puryear B #1-28 well, and the northwest quarter of Section 28. We do not agree with the Neuhoffs' contention, however, that reading the references together requires the conclusion that the interest is "necessarily limited to the northwest quarter of section 28." The references to the Puryear B #1-28 and to the northwest quarter of Section 28 confirm that the document identifies the Puryear Lease, but we are still left with the question of which of the three describes the scope of the overriding royalty interest conveyed.

7

Piranha argues that the reference to the lease identifies the interest conveyed, so Neuhoff Oil assigned all of its overriding royalties due under the Puryear Lease, which covered all of Section 28, and which (at the time of the assignment) were being produced from the Puryear B #1-28, which was located in Section 28's northwest quarter. The Neuhoffs argued in the trial court that the reference to the well identifies the interest conveyed, so Neuhoff Oil assigned only its overriding royalties in the production from the Puryear B #1-28, which was located in Section 28's northwest quarter and from which royalties derived under the Puryear Lease. The court of appeals held, and the Neuhoffs now agree, that the reference to the lands identifies the interest conveyed, so Neuhoff Oil assigned the overriding royalties produced from Section 28's northwest quarter, which (at the time of the assignment) were produced from the Puryear B #1-28 and derived from the Puryear Lease. Nothing in Exhibit A, however, expressly states whether the well, the land, or the lease identifies the scope of the interest conveyed.

### C. Rules of Construction

To support its position, Piranha relies primarily on rules we have sometimes applied when construing deeds, assignments, and similar documents. Specifically, Piranha asserts we must construe the Assignment (1) "to confer upon the grantee the greatest estate that the terms of the instrument will permit," *Waters v. Ellis*, 312 S.W.2d 231, 234 (Tex. 1958),[13] (2) to reject any alleged exception, reservation, or limitation that is not expressly and clearly stated in the written

---

[13] *See also Garrett v. Dils Co.*, 299 S.W.2d 904, 906 (Tex. 1957) ("[S]hould there be any doubt as to the proper construction of the deed . . . [it should] be held to convey the greatest estate permissible under its language."); *Sharp v. Fowler*, 252 S.W.2d 153, 154 (Tex. 1952) ("[A] deed passes whatever interest a grantor has in the land, in the absence of [l]anguage showing an intention to grant a less estate.").

8

document, *Perryman*, 546 S.W.3d at 119,[14] and (3) to resolve any doubts against the party who drafted the document, *Garrett*, 299 S.W.2d at 906. According to Piranha, the court of appeals ignored these rules and instead announced a "new rule" that permits courts to imply a limitation on a grant—even in the absence of any language that excepts or reserves an interest or otherwise limits the grant—whenever it appears to the court that the limitation is necessary to "harmonize" apparently conflicting provisions.

In response, the Neuhoffs argue that these construction rules do not apply because the Assignment is unambiguous and we can determine the parties' intent simply by harmonizing its language, as the court of appeals has done. *See, e.g.*, *Citizens Nat'l Bank*, 150 S.W.2d at 1006 ("Courts do not resort to arbitrary rules of construction where the intention of the parties is clearly expressed in unambiguous language.").[15] According to the Neuhoffs, the court of appeals properly harmonized Exhibit A's references to the well, the land, and the lease, making any reliance on arbitrary construction rules unnecessary and improper.

The Neuhoffs are correct that we have long rejected reliance on "arbitrary" rules when construing unambiguous contractual language. *See id.* And more recently, particularly in our decisions addressing mineral-interest conveyances, we have "incrementally cast off rigid, mechanical rules" and "warned against quick resort to . . . default or arbitrary rules" in favor of determining intent by "conducting a careful and detailed examination of a deed in its entirety,

---

[14] *See also Sharp*, 252 S.W.2d at 154 ("A reservation of minerals to be effective must be by clear language. Courts do not favor reservations by implication.").

[15] *See also Stewman Ranch, Inc. v. Double M. Ranch, Ltd.*, 192 S.W.3d 808, 811 (Tex. App.—Eastland 2006, pet. denied) ("These canons, however, do not apply when the deed is unambiguous.").

rather than applying some default rule that appears nowhere in the deed's text." *Wenske*, 521 S.W.3d at 792; *see Hysaw*, 483 S.W.3d at 4 (rejecting reliance on "bright-line rules of interpretation that are arbitrary and, thus, inimical to an intent-focused inquiry"); *Luckel*, 819 S.W.2d at 462 (rejecting reliance on "technicalities, or arbitrary rules") (quoting *Sun Oil*, 84 S.W.2d at 444). Relying on "default rules or other mechanical rules of construction to determine the deed's meaning is, therefore, both unnecessary and improper." *Wenske*, 521 S.W.3d at 796.

On the other hand, we have also recognized, even quite recently, that we must rely on "well-settled contract-construction principles" to determine whether a contract is ambiguous and to interpret the contract if it is not. *URI*, 543 S.W.3d at 763; *see Coker*, 650 S.W.2d at 394 (applying "the rules of construction" to "ascertain the true intention of the parties"). Indeed, our statement in *Citizens National Bank*—that courts "do not resort to arbitrary rules of construction where the intention of the parties is clearly expressed in unambiguous language"—was just the first of several "rules of construction" we listed and applied to determine the meaning of the contract at issue in that case. *Citizens Nat'l Bank*, 150 S.W.2d at 1006–07.

We have not yet endeavored to clearly distinguish between the "arbitrary," "mechanical," "default" rules we have "cast off" and the "well-settled contract-construction principles" on which we continue to rely when construing deeds and other contracts. The former category has included a "default rule" requiring a royalty interest to "be carved proportionately from the two mineral ownerships," *Wenske*, 521 S.W.3d at 795 (discussing and quoting *Pitch v. Lankford*, 302 S.W.2d 645, 650 (Tex. 1957)), "a mechanical approach requiring rote multiplication of double fractions whenever they exist," *Hysaw*, 483 S.W.3d at 4, and a rule giving certain clauses—like a "granting"

10

clause, "warranty" clause, or "habendum" clause—absolute priority over other clauses, *Luckel*, 819 S.W.2d at 462–63. By contrast, the latter category has included the rule requiring that courts construe language according to its "plain, ordinary, and generally accepted meaning" unless the instrument directs otherwise, *URI*, 543 S.W.3d at 764 (quoting *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)), the rule requiring that courts construe words "in the context in which they are used," *id.*, the rule requiring that courts avoid any construction that renders any provisions meaningless, *Coker*, 650 S.W.2d at 394, and the rule requiring courts to consider and construe all of a contract's provisions together "so that the effect or meaning of one part on any other part may be determined," *Citizens Nat'l Bank*, 150 S.W.2d at 1006. We assume Piranha would contend that the construction rules on which it relies fall within the latter category of reliable contract-construction principles, while the Neuhoffs would contend that they fall into the former category of arbitrary, mechanical, or default rules. We need not draw that distinction here, however, because even if we consider the rules Piranha urges, they do not support the outcome it requests.

The first rule Piranha cites favors construing a deed to convey not the greatest estate possible, but the greatest estate "permissible under its language." *Garrett*, 299 S.W.2d at 906; *see also Waters*, 312 S.W.2d at 234 (favoring construction that conveys "the greatest estate that the terms of the instrument will permit"). Piranha repeatedly asserts that the Assignment's granting clause conveys "*all* of [Neuhoff Oil's] right, title, and interest" in and to its overriding royalty interest under the Puryear Lease. But that's not what the clause says. Instead, it says that Neuhoff Oil conveys "all" of its "right, title, and interest *in and to the properties described in Exhibit 'A'*."

11

Under Piranha's first construction rule, we must still determine whether the language of Exhibit A, construed in context with the entirety of the Assignment's provisions, could permit the determination that it conveys "all" of Neuhoff Oil's interest in all of its overriding royalty under the Puryear Lease.

According to Piranha, the second rule on which it relies requires courts to reject any alleged "exception, reservation, or limitation" that is not expressly and clearly stated in the deed. Actually, we have said that any "reservation" must be "by clear language" and cannot be implied, and a reservation is a form of "exception" through which the grantor excludes for itself a portion of that which would otherwise fall within the deed's description of the interest granted. *Perryman*, 546 S.W.3d at 119; *Sharp*, 252 S.W.2d at 154; *see also King v. First Nat'l Bank of Wichita Falls*, 192 S.W.2d 260, 262 (Tex. 1946) (explaining that reservations and exceptions both describe "something to be deducted from the thing granted, narrowing and limiting what would otherwise pass by the general words of the grant"). This rule does not address language that describes the interest granted, but language that excludes from the grant a portion of the interest described.[16] Although overriding royalty interests are usually created by a reservation,[17] the dispute here

---

[16] As Piranha notes, we have refused to impose a "limitation" on the *duration* of a mineral lease by implication or in the absence of clear and precise language. *See Rogers v. Ricane Enters., Inc.*, 884 S.W.2d 763, 767 (Tex. 1994). Relying on *Rogers*, Piranha urges us to impose the same restriction on any attempt to "limit" the "areal extent" of Neuhoff Oil's assignment of its overriding royalty interest. But the assignment at issue in *Rogers* clearly described the interest being assigned and contained no "language limiting the duration of the assignment." *Id.* The issue there was whether to imply a limitation on the duration of the interest clearly assigned; here, the issue is what interest was assigned.

[17] *See* John K.H. Akers, Jr., *Overriding Royalty Interests: Pitfalls, Precedent, and Protection*, 50 ROCKY MTN. MIN. L. INST. 21-1, § 21.01[1] (2004) ("An overriding royalty interest . . . can be created through a conveyance, but it is more commonly created by a reservation in the assignment or transfer of an oil and gas lease.").

involves language conveying an interest rather than reserving an interest or excepting it from a conveyance.[18]

Piranha ignores that distinction, asserting that any grantor who seeks "to withhold from a conveyance any part of its estate for itself must express that intention as a reservation or exception in order to reduce the estate conveyed." But that assertion ignores "the difference between a deed that conveys only a partial interest and a deed that conveys an entire interest but reserves a part of that interest." *Wenske*, 521 S.W.3d at 806 (BOYD, J., dissenting). A grantor may withhold for itself a part of its estate *either* by granting the entire estate but reserving the portion it desires to retain *or* by granting only the portion it desires to convey. *See, e.g.*, *Harris v. Currie*, 176 S.W.2d 302, 304–05 (Tex. 1943) (explaining that a landowner may sever the mineral estate from the surface estate "either by the conveyance of the minerals alone or by the conveyance of the land with a reservation of the minerals"). Here, as Piranha itself agrees, the Assignment contains no language attempting to reserve or except anything from the interest granted, so rules governing the construction of exceptions or reservations could not apply. We must determine the interest Neuhoff Oil granted, not the interest it excepted or reserved.

Finally, Piranha relies on the rule that "should there be any doubt as to the proper construction of the deed, that doubt should be resolved against the grantors, whose language it is." *Garrett*, 299 S.W.2d at 906. This rule applies, however, only when our "doubt" about the

---

[18] The previous assignment in 1978 created the overriding royalty interest by reservation, stating that Neuhoff Oil assigned its mineral interest "SUBJECT, HOWEVER, to the Landowners' Three-Sixteenths (3/16th) Royalty Interest provided for the Lessors in said Leases and the One-sixteenth (1/16th) Overriding Royalty Interest reserved and retained by [Neuhoff Oil] in and to said Leases and Lands." Neither party argues that the 1978 assignment was in any way defective.

13

document's meaning renders the language ambiguous. *See Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 860 (Tex. 2000) (noting that rule requiring construction against the document's drafter applies only "when we construe ambiguous contracts or contracts that are reasonably susceptible to more than one interpretation"); *see also RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015) (requiring ambiguity before construing insurance policy against insurer). We might resort to this rule if we determined that the Assignment is ambiguous, but we will not rely on it when determining whether the agreement is ambiguous or when construing an unambiguous agreement.

## D. Surrounding Circumstances

While Piranha relies primarily on rules of construction, the Neuhoffs rely primarily on evidence regarding the circumstances surrounding the Assignment to support their position that Neuhoff Oil conveyed only its overriding royalties on production from Section 28's northwest quarter. In particular, the Neuhoffs rely on evidence regarding the auction process through which the sale occurred, consisting primarily of various documents that governed that process.

We agree with the Neuhoffs that "objectively determinable facts and circumstances that contextualize the parties' transaction" may help clarify the parties' intent as expressed in the text of their written agreement. *URI*, 543 S.W.3d at 757–58. The parol evidence rule prohibits us from relying on such evidence to "create ambiguity in the contract's text," *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 688 (Tex. 2017), to "augment, alter, or contradict the terms of an unambiguous contract," *URI*, 543 S.W.3d at 757–58, to "show that the parties probably meant, or could have meant, something other than what their agreement stated," *Anglo-Dutch*

14

*Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 451 (Tex. 2011), or to "make the language say what it unambiguously does not say," *Brumitt*, 519 S.W.3d at 110. But evidence of surrounding circumstances may "aid the understanding of an unambiguous contract's language," "inform the meaning" of the language actually used, and "provide context that elucidates the meaning of the words employed." *URI*, 543 S.W.3d at 757–59.[19] Here, however, the surrounding circumstances do not support either party's proposed construction of the Assignment.

The evidence establishes that Piranha purchased Neuhoff Oil's interest through an oil-and-gas clearinghouse auction involving some 1,200 separate interests in properties located in fourteen different states. The process did not involve any negotiations between the parties, and—as was the case here—the winning bidders typically acquired the interests as-is, where-is, and without any warranty or covenant of title.

A seller who desired to offer an interest for sale at the auction was first required to enter into a written agreement with the auction house. In this agreement, Neuhoff Oil agreed to "use reasonable efforts to accurately and completely describe the Properties and all working, net revenue, overriding royalty and other interests of Seller therein," on an exhibit attached to the agreement, on "all property data sheets," and on "the conveyancing instruments delivered to Buyer at the Sale." It further agreed to "provide any additional information which prospective bidders may reasonably request for the purpose of verifying the accuracy and completeness of the information concerning the Properties" and to "use reasonable efforts to respond to reasonable

---

[19] *See also Murphy Expl.*, 560 S.W.3d at 109–10; *Brumitt*, 519 S.W.3d at 109; *N. Shore Energy*, 501 S.W.3d at 602; *The Hous. Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011).

questions from prospective bidders concerning the Properties." And it also agreed that it had "not fractionalized its interest in the Properties, but rather [was] selling all of its interest in same," and was "representing all its interests in the Properties as available for sale." In the exhibit attached to this agreement, Neuhoff Oil provided a list of twenty-two different interests it wanted to sell, identifying each by state and county, the name of a well, and an estimated value. For the interest at issue here, Neuhoff Oil identified the "Puryear #1-28" well in Wheeler County, Texas, with an estimated value of $15,000.

Just as Neuhoff Oil had to enter an agreement with the auction house, Piranha had to register as a qualified bidder and make certain written representations and acknowledgements to both the auction house and the seller. Among other things, Piranha represented that it was a sophisticated buyer of oil and gas properties and interests, that it received all documents and information it reasonably required to evaluate the properties it was interested in buying, that it performed its own due diligence on those properties, that it performed "all tasks necessary to evaluate a property to [its] complete satisfaction," and that it reviewed the proposed Assignment agreement, understood its terms, and understood that those terms would prevail in the event of any conflict.

To advertise the sale, the auction house published a Sale Brochure and an Auction Catalog identifying the interests to be offered. For each interest, the Sale Brochure listed a data order number, a well name, a location, the county and state, information about the mineral interests, the operator, the seller, and various interest-specific "remarks." The Sale Brochure identified the interest at issue here as data order number 49033, the Puryear B #1-28 well, in N. Mills Ranch,

16

Wheeler County, TX, a .0375 overriding royalty interest, with Startex Operating as the operator and Neuhoff Oil as the seller. Similarly, the Auction Catalog listed the interest by identifying the well ("Puryear B 1-28"), N. Mills Ranch, Wheeler County, TX, the .0375 overriding royalty interest, the operator (Startex) and the seller (Neuhoff Oil).

In addition to these pre-auction descriptions, the auction house required Neuhoff Oil to complete a Property Data Sheet for interested bidders to review. For the interest at issue here, Neuhoff Oil completed the form by filling in relevant blanks as follows:

Property Number: \
Well Name: Puryear "B" #1-28 \
Field Name: N. Mills Ranch \
Operator Name: Startex Operating Co. \
Company Group No.: \
Seller: Neuhoff Oil & Gas Corp. \
State: TX \
County: Wheeler \
Description: NW1/4 Sect. 28, BLK A-3, H&GN \
Well Status: Producing  As Of: 4/99 \
Decimal Interest Offered For Sale (Current): \
    WI [Working Interest]: NA \
    NRI [Net Revenue Interest]: NA \
    ORRI [Overriding Royalty Interest]: .0375 \
Associated Leasehold: \
    Fed Lse ___ State Lse ___ BIA Lse ___ Fee Lse X \
Total Depth Drilled: 20,250' \
Completion Date: 12/89

Finally, upon completion of the sale, the auction house provided a Detail Invoice identifying Piranha as the buyer and describing the interest by listing the Puryear B #1-28 well, Wheeler County, TX, the .0375 overriding royalty interest, and the seller and operator.

17

The Neuhoffs contend that these documents inform the meaning of the Assignment by confirming that Neuhoff Oil conveyed only its overriding royalty interest in production from Section 28's northwest quarter. They note that the Sale Agreement, the Sale Brochure, and the Auction Catalog identified the interest by referring only to the Puryear B #1-28 well, and the Property Data Sheet and Detail Invoice referred only to the well and to Section 28's northwest quarter. Consistent with the argument they originally made in the trial court, they argue that under the Sale Agreement, the auction house only had authority to sell Neuhoff Oil's overriding royalty interest in production from the Puryear B #1-28 well. They now accept the court of appeals' holding that Piranha purchased the overriding royalty interest in production from any well in Section 28's northwest quarter, but they insist that none of these documents "even hint that the overriding royalty interest would include production from all of section 28."

Piranha contends that, consistent with the auction process, the documents referred to the Puryear B #1-28 well merely as a shorthand label for the interest offered, because it was the only producing well on the entire Puryear Lease and the only source of any overriding royalty payments at that time. It asserts that the auction documents typically described leasehold interests by using the name of a producing well on the lease, even when the interest included more than just that derived from the named well. It claims that when a seller intended to limit the interest to the named well, it added "WBO" (for "wellbore only") as a remark in the Sale Brochure—a designation that never appears in any of the descriptions of the interest at issue here. It insists that nothing in any of the documents indicates that Neuhoff Oil was offering anything less than its entire overriding royalty interest under the Puryear Lease, and it particularly relies on Neuhoff Oil's agreement that

18

it had "not fractionalized its interest in the Properties, but rather [was] selling all of its interest in same." And finally, it asserts that the Property Data Sheet referred to the "Associated Leasehold" (designated as "Fee Lse"), indicating that Neuhoff Oil was selling all of its 3.75% overriding royalty interest in all production under the Puryear Lease.

The Neuhoffs reply with several points. They say Piranha cannot rely on the Sale Agreement between Neuhoff Oil and the auction house because there's no evidence Piranha ever saw that document. They note that although Neuhoff Oil confirmed in that agreement that it had not "fractionalized" its interest, it referred specifically to its interest "in the Properties," meaning the specific interest the documents identified as the overriding royalty interest in the Puryear B #1-28 well, not in all of Section 28. They contend that nothing in the documents supports Piranha's assertion that some listings that did not contain the WBO designation were identified by a well's name even though they involved an interest in the entire lease.

We conclude that these documents fail to provide any meaningful support for either party's construction of the written Assignment. Whether treated as evidence of surrounding circumstances or as writings associated with the Assignment, all of these documents expressly prohibited the role the parties would now give them. The Sale Brochure, for example, included a "NOTE" at the bottom of every other page (including the page on which the interest at issue here is listed), providing that "Wellbore Only, Depth Limitations and other restrictions are not always represented in this publication," and parties must look to "the Data Package and Conveyance Documents for a complete representation of any restrictions associated with each property offered." Similarly, the Auction Catalog stated at the bottom of every page on which interests were listed that, "This

19

catalog is provided for convenience purposes only. All information is provided without warranty as to accuracy or completeness. Bidders should verify all information and the condition of properties being sold prior to bidding." And the Property Data Sheet included a disclaimer providing, "DUE DILIGENCE AND VERIFICATION BY BUYER IS REQUIRED – The information contained above is provided without warranty or guarantee by Seller or [the auction house] as to accuracy, completeness or otherwise." In short, each of these documents disclaimed any of the reliance the parties now place on them, and instead required the parties to look solely to the Assignment to determine the interest sold. We, therefore, will do the same.

### E. The Entirety of the Assignment

Setting aside inapplicable rules of construction and unhelpful surrounding circumstances, we return now to the Assignment. As mentioned, the Assignment's granting clause conveyed "all of [Neuhoff Oil's] right, title, and interest in and to the properties described in Exhibit 'A' (the Properties)." And the relevant page of Exhibit A identifies the well (the Puryear B #1-28), the land (NW4, Section 28), and the lease (the Puryear lease), without identifying which of the three defines the scope of the overriding royalty assigned. Standing alone, Exhibit A is at least ambiguous, if not completely unenforceable, because it fails to adequately identify the interest assigned, a term that is obviously essential and material to the parties' agreement. *See Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) ("To be enforceable, a contract must address all of its essential and material terms with 'a reasonable degree of certainty and definiteness.'") (quoting *Pace Corp. v. Jackson*, 284 S.W.2d 340, 345 (Tex. 1955)).

But our "holistic and harmonizing approach" to construing deeds and similar documents requires us to consider *all* of the Assignment's provisions and prohibits us from giving greater weight to the granting clause or to any other particular types of clauses. *Wenske*, 521 S.W.3d at 794 (citing *Luckel,* 819 S.W.2d at 462–64). Here, the Assignment's other provisions unambiguously express an objective intent to convey Neuhoff Oil's overriding royalty interest in the Puryear Lease, covering all of Section 28.[20] Four provisions in particular demonstrate this intent.[21]

First, as mentioned, Section I of the Assignment includes two numbered paragraphs immediately following the granting clause. Paragraph 1, as we have explained, begins by describing "All oil and gas leases, mineral fee properties or other interests, INSOFAR AND ONLY INSOFAR AS set out in Exhibit A . . . whether said interest consists of leasehold interest, overriding royalty interest, or both . . . ." This clause points us to Exhibit A to determine the interest conveyed, but the rest of the sentence provides, "which [interest] *shall include any* working interest, leasehold rights, overriding royalty interests and reversionary rights held by [Neuhoff

---

[20] The Dissent challenges our consideration of these provisions, arguing that because "the 'interests' conveyed are expressly limited to Exhibit A—in all caps no less," these provisions "do not amplify the description in Exhibit A," because the interest conveyed "must be described in Exhibit A." *Post* at ___ & n.13. But the lease is described in Exhibit A. Our purpose for considering other provisions, which constitute the textual context of Exhibit A, is not to expand or add to the grant or to identify some independent description of the interest assigned, but to determine what Exhibit A means by its description of the Puryear Lease. If, for example, Exhibit A identified only the well and the land but not the lease, we could not rely on other provisions to conclude that the Assignment actually conveys all interests under the lease. But Exhibit A identifies the lease, the land, and the well. In our effort to interpret the intent thus expressed in Exhibit A, our holistic and harmonizing approach requires us to consider all of the Assignment's provisions to determine Exhibit A's meaning. *See Wenske*, 521 S.W.3d at 794.

[21] The Dissent labels these provisions as "unrelated," without explaining why they are "unrelated" or what they are "unrelated" to. *Post* at ___. Because they constitute the Assignment's express terms, of course, they are directly related to the parties' agreement; and to the extent they shed light on Exhibit A's meaning, they are directly related to Exhibit A's identification of the interest assigned.

Oil], as of the Effective Date." [Emphasis added.] The parties agree that Neuhoff Oil did not hold any working interest, leasehold right, or reversionary right in the well, the land, or the lease described in Exhibit A, but it did hold an overriding royalty interest in the entire lease, which included the well and the land described. So although the paragraph limits the interest to that described in Exhibit A, that same sentence explains that the interest described in Exhibit A "include[s] any" overriding royalty interest then held by Neuhoff Oil. Giving effect as we must to all of its language, Paragraph 1 does not just incorporate Exhibit A, it explains that the interest described in Exhibit A includes any overriding royalty interest Neuhoff Oil then owned, to the extent Exhibit A identifies those interests. *See Perryman*, 546 S.W.3d at 123 (discussing conveyances and exceptions of interests "now owned by grantor").

Second, Paragraph 2 of Section I then confirms that the conveyance included:

> All presently existing contracts to the extent they are assignable and to the extent they affect the Leases, including agreements for the sale or purchase of oil, gas and associated hydrocarbons, division orders, unit agreements, operating agreements, and all other contracts and agreements arising from, connected with, or attributable to the production therefrom.

By conveying existing contracts to the extent they affect "the Leases," as opposed to just the well or the land, this paragraph further indicates that Neuhoff Oil conveyed its entire interest under the Puryear Lease. If the conveyance included only Neuhoff Oil's royalty interest in production from the Puryear B #1-28 or from Section 28's northwest quarter, there would have been no reason to convey all contracts that affect the Puryear Lease.

22

Finally, the Assignment's Section II contains five numbered paragraphs setting forth specific details about the conveyance. Paragraph 1 of Section II states that the "overriding royalty interest(s) herein assigned, if any, are payable out of and only out of the oil and gas produced, saved and marketed pursuant to the terms and provisions of the *oil and gas leases* described in EXHIBIT A." [Emphasis added.] And Paragraph 3 of that section provides that if "[Neuhoff Oil's] interest(s) in the oil and gas lease(s) described in EXHIBIT A is less than the entire interest, or if said oil and gas lease(s) cover less than the entire fee title, then the interest(s) assigned herein shall be reduced proportionately." These paragraphs point directly to the leases described in Exhibit A and confirm that the interest assigned was the interest payable from the production under the Puryear Lease (the lease described in Exhibit A), limited to the 3.75% overriding royalty interest Neuhoff Oil actually owned.

The Neuhoffs argue that this construction improperly renders the "Lands and Associated Well(s)" section of Exhibit A meaningless and superfluous. *See Coker*, 650 S.W.2d at 394 ("Courts must favor an interpretation that affords some consequence to each part of the instrument so that none of the provisions will be rendered meaningless."). According to them, Exhibit A's references to the Puryear B #1-28 and to Section 28's northwest quarter have no meaning at all unless they limit the conveyance to the overriding royalties on oil and gas produced from that well or that portion of Section 28.[22] In fact, they assert, if the Assignment conveyed the overriding royalty on

_____

[22] The Dissent agrees, asserting that our construction is "problematic" because it renders the "geographic identification" in Exhibit A "unnecessary," *post* at ___, and "superfluous," *post* at ___. Of course, the same would be true for any alternative construction, whether made by a court as a matter of law (as the Neuhoffs propose) or by a jury as a matter of fact (as the Dissent proposes). Under their analysis, construing Exhibit A to limit the assignment to Neuhoff Oil's interest in oil and gas produced from the well identified in Exhibit A would make Exhibit A's

all production under the lease, then the Lands and Associated Well(s) section "would be worse than surplusage—it would directly conflict with the 'Lease(s)' section." We disagree. As we read Exhibit A, in harmony with the Assignment's provisions discussed above, we agree with Piranha that the Lands and Associated Well(s) section simply identifies the only location on Section 28 and the only well from which oil and gas giving rise to overriding royalties was then being produced. *See Paradigm Oil*, 372 S.W.3d at 180 n.1 (noting that the value of an overriding royalty interest is determined through production at the surface). By providing this information, Exhibit A more clearly identified the Puryear Lease under which the overriding royalty existed.

Construing the Assignment in its entirety and harmonizing all of its provisions, the only reasonable construction is that Neuhoff Oil conveyed its 3.75% overriding royalty interest in all production under the Puryear Lease. We thus conclude that the Assignment unambiguously conveyed to Piranha all of that interest that Neuhoff Oil owned at the time of the conveyance.

## III.
## Conclusion

We reverse the court of appeals' judgment holding that the Assignment conveyed only the 3.75% overriding royalty interest in production from Section 28's northwest corner, and we reinstate the trial court's summary judgment declaring that the Assignment conveyed to Piranha all of Neuhoff Oil's 3.75% overriding royalty interest in production under the Puryear Lease, covering all of Section 28.

---

references to the land and the lease unnecessary and superfluous, while construing it to limit the assignment to the interest in oil and gas produced from the land would make the references to the well and the lease unnecessary and superfluous. Under their approach, any of the three possible constructions would be impermissible.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: February 21, 2020

25